INTERBUSINESS BANK, N.A., Plaintiff

v.

FIRST NATIONAL BANK OF MIFFLINTOWN, Defendant,

v.

Allied Capital Corporation, et al., Third–Party Defendants.

Civil Action No. 1:03–CV–2272.

United States District Court, M.D. Pennsylvania.

April 21, 2004.

Nedric L. Nissly, Debra P. Fourlas, McNees, Wallace & Nurick LLC, Harrisburg, PA, for Plaintiff.

Heather Z. Kelly, Thomas A. French, Rhoads & Simon, LLP, Harrisburg, PA, for Defendant.

Joseph P. Connor, III, Connor, Weber & Oberlies, P.C., Paoli, PA, Brian William Bisignani, Jennifer L. Murphy, Duane Morris LLP, Harrisburg, PA, for Third Party Defendant.

### *MEMORANDUM*

CONNER, District Judge.

Presently before the court in this Uniform Commercial Code ("U.C.C.") case are several dispositive motions in which the parties seek recognition of their respective security interests in certain collateral of a common debtor as superior to others. Plaintiff, InterBusiness Bank, N.A. ("InterBusiness"), contends that defendant, First National Bank of Mifflintown ("First National"), lacked a valid interest in the "inventory" and "accounts receivable" of the debtor and yet collected and liquidated those assets in derogation of plaintiff's superior interest. Defendant disagrees, as-

serting that assignments from third-party defendants, Allied Capital Corporation and its subsidiary and successor corporations (collectively "Allied Capital"), were effective to give it a priority interest in the collateral. Defendant further argues that plaintiff does not possess a security interest in the collateral because (1) the documents defining plaintiff's interest refer only to "goods" and "accounts," not "inventory" and "accounts receivable," and (2) any interest that plaintiff had in the collateral was extinguished when plaintiff obtained satisfaction of the underlying debt in state court execution proceedings relating to a separate mortgage agreement between plaintiff and the debtor.

The questions presented in the motions are (1) whether parties may obtain priority security interests through assignment, (2) whether generic references in a financing statement to "goods" and "accounts" are effective to cover an interest in "inventory" and "accounts receivable" of the debtor, and (3) whether a security interest in collateral is deemed extinguished by operation of Pennsylvania law when the secured party purchases the real property of the debtor during execution proceedings on the underlying debt. For the reasons that follow, these questions must all be answered in the affirmative. Finding that the complaint states a valid claim for relief and that material questions of fact remain, the court will deny the cross-motions for summary judgment (Docs. 13, 20) and the motion to dismiss (Doc. 10).

## I. Statement of Facts [1]

At the heart of this controversy are two loans made by Allied Capital, a financing corporation, to Annlick Farm Supply, Inc.

("Annlick Farm Supply"), a business in central Pennsylvania. The first of these loans, in the amount of one million dollars ($1,000,000), was made in December 2000 pursuant to a loan agreement between the parties. (Doc. 1 ¶¶ 4–8; Doc. 1, Ex. A; Doc. 15 ¶¶ 1–10; Doc. 21 ¶¶ 1–2; Doc. 22 ¶¶ 1–10; Doc. 32 ¶¶ 1–2). As collateral, Allied Capital accepted a mortgage on real property owned by Annlick Farm Supply and an interest in its accounts, inventory, equipment, and other property. This interest was memorialized by a mortgage agreement and a security agreement, both of which were executed by the parties on December 22, 2000. (Doc. 1 ¶ 5; Doc. 1, Ex. B; Doc. 15 ¶¶ 1–10; Doc. 21 ¶ 3; Doc. 22 ¶¶ 1–10; Doc. 32 ¶ 3; Doc. 34, Ex. A ¶¶ 4–6). Allied Capital also filed a financing statement, identifying the collateral in which it claimed a security interest:

1. The collateral includes (but is not limited to) all property, tangible and intangible, now owned or hereafter acquired by Debtor including, without limitation, machinery, equipment, tools, furniture, fixtures and rents:

. . . . .

4. All goods, furniture, fixtures, building and other materials, tools, supplies, and other tangible personal property of every nature now owned or hereafter acquired by Debtor and used, intended for use, or usable in the construction, development, or operation of the Property, whether located on the Property or elsewhere, together with all accessions thereto, replacements and substitutions therefor and proceeds thereof;

---

1. In accordance with the standards of review for motions for summary judgment and for dismissal, the court will present the facts as gleaned from the complaint, supporting exhibits, and statements of material facts in the light most favorable to the non-moving parties. *See infra* Part II. Discrepancies between the pleadings and evidence, when relevant, will be noted.

5. The right to use the trademark or trade name of Debtor and symbols or logos used in connection therewith, or any modifications or variations thereof, in connection with the operation of the improvements existing or to be constructed on the Property, together with all accounts, all contracts and contract rights and all plans, specifications, licenses, permits and other general intangibles (whether now owned or hereafter acquired, and including proceeds thereof) relating to or arising from Debtor's ownership, construction, use, operation, leasing or sale of all or any part of the Property. . . .

(Doc. 1, Ex. B). The statement was filed with state and local government offices in January and February 2001. (Doc. 1 ¶ 5; Doc. 15 ¶¶ 1–10; Doc. 21 ¶¶ 4–6; Doc. 22 ¶¶ 1–10; Doc. 32 ¶¶ 4–6).

Soon after making the first loan, Allied Capital made a second loan to Annlick Farm Supply in the amount of $1,250,000.[2] The parties executed another security agreement, giving Allied Capital an interest in the inventory and accounts of the business as collateral for the second loan. (Doc. 1 ¶¶ 9–10; Doc. 15 ¶¶ 11–12; Doc. 21 ¶¶ 9–12; Doc. 22 ¶¶ 11–12; Doc. 32 ¶¶ 9–12). Soon thereafter, Allied Capital filed a second financing statement identifying the collateral claimed under the second security agreement:

All tangible and intangible property of the Debtor, whether now owned or hereafter acquired, wherever located, including, but not limited to, the Debtor's interest now owned and hereafter ac-

quired in the following types or items of property:

. . . . .

(ii) all inventory of every nature, kind and description. . . .

(iii) all accounts, accounts receivable, [and] contract rights . . . arising out of the sale, lease or consignment of goods, or the rendition of services by the Debtor. . . .

(Doc. 1, Ex. E). This second financing statement was filed with state and local government offices in January and February 2001, after Allied Capital had filed the financing statement relating to the first loan agreement. (Doc. 1, Ex. E; Doc. 15 ¶¶ 5, 7, 9, 12–13; Doc. 22 ¶¶ 4, 11; Doc. 22 ¶¶ 5, 7, 9, 12–13; Doc. 32 ¶¶ 4, 11).

In a series of subsequent transfers, certain interests held by Allied Capital arising from the first and second loans were assigned to other corporations. All of the interests arising under the first loan, including the loan agreement, mortgage agreement, security agreement, and initial financing statement, were assigned to InterBusiness on July 30, 2001. (Doc. 1 ¶¶ 6–8; Doc. 15 ¶¶ 1–10, 17; Doc. 21 ¶¶ 7–8; Doc. 22 ¶¶ 1–10, 17; Doc. 32 ¶¶ 7–8). With respect to the second loan, Allied Capital retained its interests in the loan and security agreements, and transferred only its interest in the second financing statement. Through amendments filed with the appropriate government offices, Allied Capital's interest in this second financing statement was assigned to First National in April 2001.[3] (Doc. 1 ¶ 13; Doc. 15 ¶ 17; Doc. 21 ¶ 11; Doc. 22 ¶ 17; Doc. 32 ¶ 11).

---

2. The parties dispute whether the second loan was made by Allied Capital Corporation or its subsidiary, Allied Capital SBLC Corporation. (Doc. 21 ¶ 9; Doc. 32 ¶ 10). The precise identity of the lender is immaterial for purposes of the instant motions.

3. The parties dispute whether First National received an assignment of the second loan security agreement. (Doc. 22 ¶ 17). This fact is immaterial for purposes of the instant motions.

In May 2001, First National extended to Annlick Farm Supply a revolving line of credit in the amount of $500,000 (later increased by $200,000) pursuant to a loan agreement between the parties. They also executed a security agreement giving First National an interest in "all inventory and accounts" as collateral for the loan. (Doc. 1 ¶ 12; Doc. 15 ¶¶ 14–16; Doc. 21 ¶ 14; Doc. 22 ¶¶ 14–16; Doc. 32 ¶ 14).

In July 2002, Annlick Farm Supply defaulted on its obligations under the loan agreement between it and First National. Soon thereafter, First National collected the accounts receivable of Annlick Farm Supply and liquidated its inventory, garnering approximately $450,000. (Doc. 1 ¶¶ 22–23; Doc. 4 ¶¶ 22–23; Doc. 21 ¶¶ 19–20; Doc. 32 ¶¶ 19–20).

In October 2002, other creditors of Annlick Farm Supply commenced involuntary bankruptcy proceedings against the company. InterBusiness moved for relief from the automatic stay to allow it "to exercise its state law rights and remedies against the Collateral and Real Property" of the debtor. (Doc. 34, Ex. A at 4). The bankruptcy court granted the request, and InterBusiness obtained judgment by confession against Annlick Farm Supply in a Pennsylvania trial court for sums owing under the loan agreement between the parties. (Doc. 34, Ex. B; Doc. 40 ¶¶ 2–4). A writ of execution was issued, and the real property subject to the mortgage agreement was sold to InterBusiness on May 1, 2003. (Doc. 34, Exs. B, C; Doc. 40 ¶¶ 2–4). Following its purchase, InterBusiness did not file a petition to fix the fair market value of the property or take other action to determine the debt, if any, still owed by Annlick Farm Supply. (Doc. 34, Ex. D).

InterBusiness filed the complaint *sub judice* on December 12, 2003. (Doc. 1). The complaint asserts that InterBusiness's security interest in the inventory and ac-counts receivable of Annlick Farm Supply is superior to that of First National, and demands remittance of the proceeds of the liquidation of those assets. (Doc. 1 at 8). First National then filed a third-party complaint against Allied Capital, including claims of fraud and misrepresentation based on Allied Capital's alleged assurances that First National would obtain a first-priority position through assignment of the second loan financing statement. (Doc. 6).

Soon thereafter, Allied Capital filed a motion to dismiss, claiming that, under the allegations of the original complaint, InterBusiness did not have a perfected security interest in the inventory and accounts receivable of Annlick Farm Supply. (Docs. 10, 11). First National then filed a motion for summary judgment, incorporating and "amplif[ying]" the argument that InterBusiness lacked an interest in the collateral. (Doc. 14 at 3 n. 1). InterBusiness responded with a cross-motion for summary judgment, claiming that it had a priority interest and was entitled to judgment as a matter of law. (Docs. 20, 25). The last of the multiple briefs and exhibits supporting and opposing the motions was filed on April 8, 2004. (Doc. 39).

## II. *Standard of Review*

■ Concurrent resolution of cross-motions for summary judgment can present a formidable task. *See* 10A Charles Alan Wright et al., Federal Practice and Procedure § 2720 (3d ed.1998). Federal Rule of Civil Procedure 56 mandates that the court view all facts in the light most favorable to the non-moving party, giving that party the benefit of all reasonable inferences. *See* Fed.R.Civ.P. 56; *Schnall v. Amboy Nat'l Bank,* 279 F.3d 205, 209 (3d Cir. 2002). However, the Rule does not explain the proper practice when the plaintiff and the defendant are both non-moving par-

ties. *See* FED.R.CIV.P. 56; 10A WRIGHT ET AL., *supra*, § 2720. Inferences to which a party is entitled with respect to the opponent's motion may not be granted with respect to its own. *United States v. Hall*, 730 F.Supp. 646, 648 (M.D.Pa.1990). In such circumstances, Rule 56 requires two statements of the "facts" of the same case, a proposition that may counsel separate opinions on the respective motions. *See Rains v. Cascade Indus., Inc.*, 402 F.2d 241, 245 (3d Cir.1968); *Hall*, 730 F.Supp. at 648; 10A WRIGHT ET AL., *supra*, § 2720.

Similarly problematic is simultaneous review of motions for summary judgment and for dismissal. Federal Rules of Civil Procedure 12(b)(6) and 56 both mandate equivalent *standards* of review, requiring consideration of all facts in the light most favorable to the non-moving party, but they prescribe significantly different *scopes* of review. *See* 5A CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE & PROCEDURE § 1366 (2d ed.1990). Rule 12(b)(6) strictly limits the court to the face of the pleadings, aided only by materials relied upon in the complaint or otherwise of unquestioned validity. FED. R.CIV.P. 12(b)(6); *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir.1997); *Oshiver v. Levin, Fishbein, Sedran & Berman*, 38 F.3d 1380, 1384 n. 2 (3d Cir.1994). In contrast, Rule 56 not only permits the court to consider extrinsic evidence, but requires the non-moving party to produce such evidence when a material element of the claim is in doubt. FED. R.CIV.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

■ Fortunately, these distinctions are without difference in the present case.

The basic facts of the case, as alleged in the pleadings, are substantially undisputed and have been borne out by the declarations and exhibits of the parties. Whether the complaint or the evidence is viewed in the light most favorable to plaintiff, defendant, or third-party defendants, the same conclusions generally inhere. The few evidentiary discrepancies that do exist may be noted as necessary, satisfying the dictates of Rules 12(b)(6) and 56 while permitting efficient resolution of the instant motions. *See* FED.R.CIV.P. 1 ("These rules ... shall be construed and administered to secure the just, speedy, and inexpensive determination of every action."); 10A WRIGHT ET AL., *supra*, § 2720.

### III. *Discussion*[4]

Article 9 of the U.C.C., first enacted in Pennsylvania in 1953, *see* Act of Apr. 6, 1953, Pub.L. No. 3, 1953 Pa. Laws 1, overhauled the formalistic common law secured transactions regime, installing a simplified and functional set of terms and procedures for creating and enforcing secured interests in property. 13 PA. CONS.STAT. § 9101 cmt. (1999); 4 JAMES J. WHITE & ROBERT S. SUMMERS, UNIFORM COMMERCIAL CODE § 30–1 (4th ed.1995). In return for the extension of credit or other financing arrangements, the "secured party" is entitled to take a "security interest" in the "collateral" of the "debtor." 13 PA. CONS.STAT. §§ 9102, 9203 (2002); *id.* §§ 9105, 9203 (1999); *see also id.* § 9101 cmt.; 4 WHITE & SUMMERS, *supra*, §§ 31–1 to –3. The precise form of the transaction is relatively immaterial. *Id.* So long as the exchange includes the provision of credit and the release of an interest in property as security for the debt, Article 9 generally ap-

---

4. The following discussion relies, as it must in this diversity action, on Pennsylvania law. *See Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 79–80, 58 S.Ct. 817, 82 L.Ed. 1188 (1938); *see also Menichini v. Grant*, 995 F.2d 1224, 1228 (3d Cir.1993) (applying Pennsylvania version of the U.C.C.); *Marine Midland Bank v. Surfbelt, Inc.*, 718 F.2d 611, 613 (3d Cir. 1983) (applying ·Pennsylvania Deficiency Judgment Act).

plies. *Id.; see* 13 PA. CONS.STAT. § 9203 (2002); *id.* § 9203 (1999); *see also id.* § 9101 cmt.

Among the most important concepts in the U.C.C. secured transactions system are "attachment" and "perfection." 4 WHITE & SUMMERS, *supra,* § 31–1. By attaching certain assets of the debtor, the creditor gains a security interest in those assets that may be enforced against the debtor in the event of default. 13 PA. CONS.STAT. §§ 9203, 9601 (2002); *id.* §§ 9203, 9504–9505 (1999). Only through attachment may a creditor gain the right to collect and liquidate specific assets of the debtor. *Id.* §§ 9203, 9601 (2002); *id.* §§ 9203, 9504–9505 (1999); 4 WHITE & SUMMERS, *supra,* §§ 34–1, 34–5. Attachment generally requires execution of a "security agreement" that reasonably identifies the assets offered by the debtor as collateral for the extension of credit. 13 PA. CONS. STAT. §§ 9108, 9203 (2002); *id.* §§ 9110, 9203 (1999).

 Closely related to attachment is "perfection." *See* 4 WHITE & SUMMERS, *supra,* § 31–1. By perfecting an interest, the creditor is entitled to take "priority" in the collection and liquidation of the assets of the defaulting debtor as against other creditors with unperfected security interests in the same collateral. 13 PA. CONS. STAT. §§ 9317, 9322 (2002); *id.* §§ 9301, 9312 (1999); 4 WHITE & SUMMERS, *supra,* §§ 31–1, 37–1. A creditor that violates priority rules, liquidating assets in which it holds a subordinate interest, may be liable to a party with a superior perfected interest. *See Chrysler Credit Corp. v. Smith,* 434 Pa.Super. 429, 643 A.2d 1098, 1102 (1994), *cited in In re Varsity Sodding Serv.,* 139 F.3d 154, 156 (3d Cir.1998); *see also* 13 PA. CONS.STAT. §§ 9317, 9322 (2002);

*id.* §§ 9301, 9312 (1999); 4 WHITE & SUMMERS, *supra,* §§ 31–1, 37–1. Perfection requires (1) attachment and (2) the filing of a financing statement with state and local government offices indicating the debtor, the secured party, and the collateral attached.[5] 13 PA. CONS.STAT. §§ 9308(a), 9310(a), 9502 (2002); *id.* §§ 9302, 9303(a), 9402 (1999). The steps may be completed in any order, meaning that a party may file a financing statement covering collateral before the party gains a security interest in the assets, but the interest will be perfected only when both requisites are satisfied. *Id.* §§ 9308(a), 9310(a), 9502 (2002); *id.* §§ 9302, 9303(a), 9402 (1999); *Credit Alliance Corp. v. Jebco Coal Co.,* 688 F.2d 10, 13 (3d Cir.1982); *Heights v. Citizens Nat'l Bank,* 463 Pa. 48, 342 A.2d 738, 742–45 (1975); 4 WHITE & SUMMERS, *supra,* §§ 31–1, 37–1.

When two or more parties hold perfected security interests in the same collateral, priority is determined according to the dates of filing of the parties' respective financing statements. 13 PA. CONS.STAT. § 9322(a)(1) (2002); *id.* § 9312(e)(1) (1999); *see also Credit Alliance,* 688 F.2d at 13; *Heights,* 342 A.2d at 742–45. Under this "pure race" system, the party who holds the first-filed statement covering the collateral takes priority over other creditors. 4 WHITE & SUMMERS, *supra,* § 33–4; *see* 13 PA. CONS.STAT. § 9322(a)(1) (2002); *id.* § 9312(e)(1) (1999); *see also Chrysler Credit Corp. v. B.J.M., Jr., Inc.,* 834 F.Supp. 813, 830 (E.D.Pa.1993); *Heights,* 342 A.2d at 742–45. It does not matter when the interest was perfected or whether the party held a security interest at the time of filing. 13 PA. CONS.STAT. §§ 9308(a), 9310(a), 9502(d) (2002); *id.*

---

**5.** Perfection may also be achieved in certain instances through possession or through mere attachment. *See* 13 PA. CONS.STAT. §§ 9309, 9312–9314 (2002); *id.* §§ 9203, 9302, 9304–

9306 (1999); 4 WHITE & SUMMERS, *supra,* § 31–7. None of the parties contend that these exceptions to the general filing requirement apply in this case.

§§ 9302, 9303(a), 9402(a) (1999); *see also Credit Alliance*, 688 F.2d at 13; *Heights*, 342 A.2d at 742–45. Between two creditors with perfected interests in the same collateral, the party with the first-filed statement generally enjoys priority rights to collect and liquidate the collateral in satisfaction of the debt. 13 PA. CONS.STAT. §§ 9308(a), 9310(a), 9322(a)(1), 9502 (2002); *id.* §§ 9302, 9303(a), 9312(e)(1), 9402(a), (d) (1999); *Bigelow–Sanford, Inc. v. Sec.-Peoples Trust Co.*, 304 Pa.Super. 167, 450 A.2d 154, 156 (1982), *cited in Chrysler Credit*, 834 F.Supp. at 830; 1 BARKLEY CLARK, THE LAW OF SECURED TRANSACTIONS UNDER THE UNIFORM COMMERCIAL CODE ¶¶ 2.11(2), 2.16 (1994 & Supp.2003); 4 WHITE & SUMMERS, *supra*, §§ 31–1, 31–19, 37–1.

From this relatively simple outline emerges a host of intricate issues with respect to the existence and priority of the conflicting claims of InterBusiness and First National in the inventory and accounts receivable of Annlick Farms. Each party claims that the other failed to satisfy the requirements for perfection. In addition, First National alleges that, subsequent to attachment, InterBusiness attained full satisfaction of its debt through purchase of the debtor's real estate in execution proceedings, extinguishing any security interest that it held and giving First National first priority in collection.

Further complicating these difficult questions are choice-of-law issues arising from major revisions to Article 9 enacted in Pennsylvania in 2001. *See* Uniform Commercial Code Modernization Act of 2001, Pub.L. No. 123, 2001 Pa. Laws 18. These amendments significantly altered several provisions of Article 9, including those governing priority and perfection. *See* 13 PA. CONS.STAT. § 9101 cmt. 4 (2002) (providing summary of revisions). The effective date of the revised Article was July 1, 2001. *Id.* § 9701. Because the transactions and events involved in the present

case occurred both before and after this date, the question becomes whether the revised or former Article 9 should apply.

To resolve such issues, the amendments include a number of "transition" provisions governing choice of law when transactions straddle the effective date of the revised Article. *See id.* §§ 9700–9710. Section 9709 prescribes the version of Article 9 applicable to determine perfection and priority in the instant case:

> Revised [Article] 9 determines the priority of conflicting claims to collateral. However, if the relative priorities of the claims were established before Revised [Article] 9 takes effect, Former [Article] 9 determines priority.

*Id.* § 9709. This section functions as a grandfather clause, protecting interests that enjoyed priority under former Article 9 but would lose that status under the revised provisions. *See id.* § 9709 cmt. 1. It ensures that "the mere taking effect of [revised Article 9] does not of itself adversely affect the priority of conflicting claims to collateral." *Id.*; Harry C. Sigman & Edwin E. Smith, *Revised U.C.C. Article 9's Transition Rules: Insuring a Soft Landing*, 55 BUS. LAW. 1065, 1103–06 (2000).

Whether the relative priorities of conflicting claims were "established" before revised Article 9 took effect hinges on whether the respective security interests were perfected prior to the Article's effective date. *See* 13 PA. CONS.STAT. § 9709 cmt. 1 (2002); Dan L. Nicewander, *Summarizing the UCC Article 9 Revisions*, CONSUMER FIN. L.Q. REP., Spring–Fall 2001, at 128, 131; Sigman & Smith, *supra*, at 1103–06. Priority depends primarily on perfection. 13 PA. CONS.STAT. § 9322 (2002); *id.* § 9312 (1999). As soon as all conflicting security interests are perfected, priority among the claims is established. *Id.* § 9322 (2002); *id.* § 9312 (1999); *see*

*also id.* § 9709 cmt. 1 (2002); Sigman & Smith, *supra,* at 1103–06. If all competing claims were perfected under former Article 9, then those provisions continue to govern perfection and priority even after the effective date of the revised Article.[6] 13 PA. CONS.STAT. § 9709(a) (2002); Sigman & Smith, *supra,* at 1103–06.

The choice-of-law inquiry is thus subsumed within an examination of perfection and priority. If the security interests of both InterBusiness and First National were perfected prior to July 1, 2001, the former Article applies and determines their respective priorities. *See* 13 PA. CONS.STAT. § 9709(a) (2002). The court will first address this issue and then, applying the appropriate version of Article 9, determine which party has an enforceable priority interest in the collateral at issue.

### A. Perfection and Priority Under Former Article 9

Whether and when the parties attained perfected security interests depend on the validity and effect of the various assignments from Allied Capital, on which each party relies to support its claim. Article 9 adopts a liberal attitude towards assignment of security interests, not only recognizing the inherent validity of such transactions but endowing the assignee with priority rights held by the assignor. *See id.* § 9302 (1999); *Himes v. Cameron County Constr. Corp.,* 497 Pa. 637, 444 A.2d 98, 99 n. 1, 100 (1982). Once perfected, a security interest can be assigned freely without adverse effect on perfection or priority. 13 PA. CONS.STAT. §§ 9302,

9303(a), 9402(a) (1999); 4 WHITE & SUMMERS, *supra,* §§ 31–1, 31–19, 37–1; *see also Heights,* 342 A.2d at 745. In other words, an interest that is perfected by one party does not lose this status in subsequent assignments.[7] 13 PA. CONS.STAT. § 9302(b) (1999); *Heights,* 342 A.2d at 745.

■ Through assignment, InterBusiness obtained a perfected security interest. As part of the first loan to Annlick Farm Supply, Allied Capital executed a security agreement and filed a financing statement in February 2001, thus perfecting its interest in collateral identified in the statement. *See* 13 PA. CONS.STAT. §§ 9302, 9303(a), 9402 (1999). These assets, including the obligations owed under the first loan agreement, were subsequently assigned to InterBusiness. These assignments altered the identity of the secured party, but not the perfected status of the interest. *See id.* § 9302(b). Clearly, the security interest later assigned to InterBusiness was perfected as of February 2001.

■ Whereas InterBusiness was assigned Allied Capital's entire perfected interest, including the underlying loan agreement and financing statement, First National was assigned only the financing statement filed with respect to the second loan. Assignment of a financing statement alone, achieved through a publicly filed amendment naming the assignee as secured party of record, is ineffective to transfer a perfected interest in the collateral at issue. Perfection requires both attachment and a properly filed financing

---

6. Other transition provisions prescribe the effect of the revised Article's enactment on the perfected status of security interests created before the effective date. *See* 13 PA. CONS STAT. §§ 9703–9704 (2002). These provisions apply only to disputes among creditors whose relative interests were not perfected before July 1, 2001 (or have since changed in terms of priority classification). *See id.* § 9709(a).

7. It is worth reiterating that "perfection" does not apply to a particular *party,* but to the *interest* itself. *See* 13 PA. CONS.STAT. § 9302(b), 9303(a), 9402 (1999); 1 CLARK, *supra,* ¶¶ 2.11(2), 2.16; 4 WHITE & SUMMERS, *supra,* § 31–19; *see also* 13 PA. CONS.STAT. § 9709(a) (2002) (referring to priorities of "claims," not parties). For this reason, assignment of an interest does not extinguish perfected status.

statement. *Id.* §§ 9302, 9303(a), 9402. Without attachment, there can be no perfection. *Id.*

■ Assignment of a "bare" financing statement, divorced from any underlying security interest, is nonetheless a valuable asset. As discussed previously, among perfected interests, priority is determined from the date of the first-filed financing statement. *See id.* § 9312(e)(1); 4 WHITE & SUMMERS, *supra,* § 33–4. It matters not whether the financing statement was filed before or after the security interest attached or whether the current secured party filed the statement initially. 13 PA. CONS.STAT. § 9402(a), (d) (1999); *see also In re Robert B. Lee Enters., Inc.,* 980 F.2d 606, 608–09 (9th Cir.1992); *In re Camp Town, Inc.,* 197 B.R. 139, 142–43 (Bkrtcy. D.N.M.1996); *Corporate Financers, Inc. v. Voyageur Trading Co.,* 519 N.W.2d 238, 241–42 (Minn.Ct.App.1994). Regardless of subsequent amendments to the secured party of record, a financing statement continues to provide notice to creditors of a claimed security interest in the debtor's collateral from the date on which it is filed. *See Robert B. Lee,* 980 F.2d at 608–09; *Camp Town,* 197 B.R. at 142–43; *Corporate Financers,* 519 N.W.2d at 241–42, 1 CLARK, *supra,* ¶¶ 2.11(2), 2.16. Assignments affect neither the filing date of the statement nor the ability of subsequent assignees to take the superior priority status that accompanies an earlier filing date. *See* 13 PA. CONS.STAT. §§ 9302, 9303(a), 9402(a), (d) (1999); *see also Camp Town,* 197 B.R. at 142–43; *Corporate Financers,* 519 N.W.2d at 241–42, 1 CLARK, *supra,* ¶¶ 2.11(2), 2.16; 4 WHITE & SUMMERS, *supra,* §§ 31–1, 31–19, 37–1. Whatever the path followed, as soon as a party holds a security interest (arising through attachment of collateral) and is named as a secured party in a financing statement covering the collateral, the interest is perfected and priority is established as of the original date of filing. 13 PA. CONS.STAT. §§ 9302, 9303(a),

9402(a) (1999); *see also Robert B. Lee,* 980 F.2d at 608–09; *Camp Town,* 197 B.R. at 142–43; *Corporate Financers,* 519 N.W.2d at 241–42; 4 WHITE & SUMMERS, *supra,* §§ 31–1, 31–19, 37–1.

■ By assignment of the financing statement from Allied Capital and execution of its own security agreement with Annlick Farm Supply, First National gained a perfected interest in the collateral of Annlick Farm Supply. The financing statement eventually transferred to First National was initially filed by Allied Capital as part of the second loan to Annlick Farm Supply. At the time of its assignment, an amendment was filed substituting First National as the secured party of record. That First National did not have a security interest in the collateral when it received the financing statement is immaterial, since the prerequisites for perfection may be satisfied in any order. 13 PA. CONS.STAT. §§ 9302, 9303(a), 9402(a) (1999). As soon as First National made its own loan to Annlick Farm Supply in May 2001, attaching the collateral through execution of a security agreement, the interest was perfected. *See id.*

In arguing that First National could not acquire a perfected security interest through the second loan financing statement without concurrent assignment of the second loan and security agreements, InterBusiness misapprehends the nature and purpose of a financing statement. A financing statement does not relate to particular security interest, to which it is inextricably bound following perfection. Rather, it serves only to mark certain collateral of the debtor as potentially subject to a claim. *See* 13 PA. CONS.STAT. §§ 9302, 9303(a), 9402(a) (1999); *see also Robert B. Lee,* 980 F.2d at 608–09; *Camp Town,* 197 B.R. at 142–43; *Corporate Financers,* 519 N.W.2d at 241–42; 4 WHITE & SUMMERS, *supra,* §§ 31–1, 31–19, 37–1. Fi-

nancing statements cover collateral, not security interests. *See* 13 PA. CONS.STAT. §§ 9302, 9303(a), 9402(a) (1999). Once filed and effective to perfect a certain interest, the statement may be assigned freely, with or without assignment of the original security interest, and used by subsequent creditors to perfect different interests in the same collateral. *Camp Town*, 197 B.R. at 142–43; *Corporate Financers*, 519 N.W.2d at 241–42; *see also* 13 PA. CONS.STAT. §§ 9302, 9303(a), 9402(a), (d) (1999). It is thus immaterial that First National received a "bare" financing statement, without assignment of the security interest evinced by the second loan and security agreements. Once it acquired a security interest in the collateral covered by the statement, First National's new interest was perfected, regardless of the ownership of the original security interest.

■■■ Both parties in this case perfected their respective security interests prior to July 1, 2001, the effective date of revised Article 9. Thus, former Article 9 governs priority of the claims at issue. *See id.* § 9709(a) (2002). Because the financing statement assigned to InterBusiness was filed before the one assigned to First National, InterBusiness enjoyed a priority perfected interest in the collateral described in the financing statement. *See id.* § 9312(e)(1) (1999). The priority of this interest remained unchanged by enactment of revised Article 9. *See id.* § 9709(a) (2002).

**B. Description of Collateral**

Concluding that InterBusiness held a priority security interest in certain collat-

eral of Annlick Farm Supply does not, of course, answer the question of what particular assets this interest covered. A financing statement is effective to perfect a security interest only to the extent that the statement adequately describes the collateral at issue. *Id.* §§ 9401–9402 (1999); 1 CLARK, *supra*, ¶ 2.09(c); 4 WHITE & SUMMERS, *supra*, § 31–18(d). Whether InterBusiness can claim an interest in the "inventory" and "accounts receivable" of Annlick Farm Supply hinges on whether the financing statement assigned to it, identifying an interest in "goods" and "accounts," satisfies the description requirements of former Article 9.[8]

Section 9402 of the former Article establishes the minimum requirements for a description of collateral:

> A financing statement is sufficient if it ... contains a statement indicating the types ... of collateral.

13 PA. CONS.STAT. § 9402 (1999). Under this provision, the statement must identify the collateral by "type."[9] *Id.* Unfortunately, former Article 9 does not provide a definition for the term. *See id.* § 9105. While the Third Circuit has held that description by "type" mandates more specificity than references to "all assets of the debtor," *see In re Bennett Co.*, 588 F.2d 389, 392 (3d Cir.1978), neither federal nor Pennsylvania courts have reached consensus as to the permissible level of generalization. *See* 1 CLARK, *supra*, ¶ 2.09(c); 4 WHITE & SUMMERS, *supra*, § 31–18(d).

■■■ Issues of statutory interpretation are customarily resolved by resort to the plain meaning of the terms, as found in

---

8. Because former Article 9 governs perfection and priority, it controls this issue. 13 PA. CONS.STAT. § 9709 cmt. 1 (2002); Sigman & Smith, *supra*, at 1103–06.

9. Former Article 9 also permits description by "item." 13 PA. CONS.STAT. § 9402 (1999). None of the parties asserts that the financing

statement assigned to InterBusiness describes the collateral by item, and the Third Circuit has held that description by type requires less specificity than by item. *See In re Bennett Co.*, 588 F.2d 389, 392 (3d Cir.1978). Therefore, the court will address only whether the financing statement satisfies the requirement of description by type.

general reference materials. *See* 1 Pa. Cons.Stat. § 1921 (2002); *Ramich v. Worker's Comp. Appeal Bd.,* 564 Pa. 656, 770 A.2d 318, 322 (2001); *see also Carter v. United States,* 530 U.S. 255, 271, 120 S.Ct. 2159, 147 L.Ed.2d 203 (2000). Consulting these sources in this case, however, raises more questions than it answers. A multitude of entries appear under the heading "type," none of which limits its meaning in an appreciable way. *See* Webster's Third New International Dictionary 2302 (Philip Babcock Gove ed., 1993) (defining "type" as, *inter alia,* "something that serves as a symbolic representation," "a figurative representation," "a distinctive mark or sign," "qualities common to a number of individuals that serve to distinguish them as an identifiable class or kind," and "a particular kind, class, or group"). Incorporating these broad definitions as the meaning of "type" for purposes of section 9402 would eviscerate any restrictive effect of the term, permitting any description, no matter how broad, to suffice. This would render the term superfluous. *See* 1 Pa. Cons.Stat. § 1921(a) (2002) ("Every statute shall be construed, if possible, to give effect to all its provisions."); *TRW Inc. v. Andrews,* 534 U.S. 19, 31, 122 S.Ct. 441, 151 L.Ed.2d 339 (2001) ("It is 'a cardinal principle of statutory construction' that 'a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant.' ") (quoting *Duncan v. Walker,* 533 U.S. 167, 174, 121 S.Ct. 2120, 150 L.Ed.2d 251 (2001)).

■ Although the statute does not provide an explicit definition of "type," other provisions offer interpretive clues. Words draw meaning from those around them, and context sheds light on language otherwise obscured. *See United States v. Cleveland Indians Baseball Co.,* 532 U.S. 200, 217–18, 121 S.Ct. 1433, 149 L.Ed.2d 401 (2001) ("[S]tatutory construction 'is a holistic endeavor' and . . . the meaning of a provision is 'clarified by the remainder of the statutory scheme . . . [when] only one of the permissible meanings produces a substantive effect that is compatible with the rest of the law.' ") (quoting *United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., Ltd.,* 484 U.S. 365, 371, 108 S.Ct. 626, 98 L.Ed.2d 740 (1988)); *see also* 1 Pa. Cons.Stat. § 1922 (2002). Within the general application sections of former Article 9 appears a list of defined phrases, identifying the parties to secured transactions, the documents employed, and—most importantly for these purposes—the categories of collateral that may be involved. 13 Pa. Cons.Stat. §§ 9105–9107, 9109, 9115 (1999). Among these terms are "goods" and "accounts." *Id.* Although Article 9 does not expressly title them as such, these defined terms may be deemed "types" of collateral, reference to which satisfies section 9402.

Courts and commentators have struggled with this issue.[10] *See Bennett Co.,* 588 F.2d at 392 (identifying issue but declining to resolve it as unnecessary to disposition of the case); Richard C. Tinney,

---

10. *Compare In re Dillard Ford, Inc.,* 940 F.2d 1507, 1512 (11th Cir.1991) (stating that categories defined in Article 9 constitute "types" of collateral for purposes of description requirement), *and In re Turnage,* 493 F.2d 505, 506–07 (5th Cir.1974) (same), *and In re Varney Wood Prods., Inc.,* 458 F.2d 435, 436–38 (4th Cir.1972) (same), *and In re Platt,* 257 F.Supp. 478, 481 (W.D.Pa.1966) (same), *and* 1 Clark, *supra,* ¶ 2.09(5)(c)(ii) (same), *and* 4 White & Summers, *supra,* § 31.18 (same), *with In re Lehner,* 427 F.2d 357, 358 (10th Cir. 1970) (per curiam) (stating that categories defined in Article 9 do not constitute "types" of collateral), *and* 1 Grant Gilmore, Security Interests in Personal Property § 15.3 (1965) (same), *and* 8A Ronald A. Anderson, Anderson on the Uniform Commercial Code § 9–110:46 (3d ed.1996) (same).

Annotation, *Sufficiency of description of collateral in financing statement under UCC §§ 9–110 and 9–402*, 1980 WL 131122, 100 A.L.R.3d 10 (2000) (collecting cases). Authorities finding such references inadequate to meet the U.C.C. description requirement stress the need for specificity in transactions. *In re Lehner*, 303 F.Supp. 317, 319–20 (D.Colo.1969), *aff'd*, 427 F.2d 357 (10th Cir.1970); 1 GRANT GILMORE, SECURITY INTERESTS IN PERSONAL PROPERTY § 15.3 (1965); J. HONNOLD, CASES AND MATERIALS ON THE LAW OF SALES AND SALES FINANCING 507 (3d ed.1968). Those to the contrary emphasize the notice function of the financing statement, arguing that use of the terms defined in Article 9 adequately describes the claimed interest to alert creditors of the need for further investigation. *See In re Dillard Ford, Inc.*, 940 F.2d 1507, 1512 (11th Cir.1991); 1 CLARK, *supra*, ¶ 2.09(5)(c)(ii).

The latter interpretation, accepting the defined terms as "types" of collateral for purposes of section 9402, offers the only viable method for limiting the scope of "type" and remaining within the bounds of the statute. While Article 9 ascribes a broad meaning to several of the enumerated categories of collateral, these definitions are sufficiently limited to give potential creditors notice of whether a security interest may exist. *See* 13 PA. CONS.STAT. § 9105 (1999). Construing these categories as "types" of collateral provides both courts and parties with a standardized method by which to determine whether a statement satisfies the description requirement and perfects a security interest in particular collateral. *See* 1 PA. CONS.STAT. § 1927 (2002) ("Statutes uniform with those of other states shall be interpreted and construed to effect their general purpose to make uniform the laws of those states which enact them.").

The alternative would be an *ad hoc* analysis of each specific term used in every financing statement to decide whether, based on evanescent guidelines, it constitutes a "type" of collateral. Such inquiries would engender doubt in the commercial community and defeat the central purpose of the U.C.C.: uniformity in transactions. *See* 13 PA. CONS.STAT. § 1102(b) (1999); *see also* 1 PA. CONS.STAT. §§ 1922(1), 1927 (2002) (providing that statutes should be construed to avoid absurd results and achieve uniformity); *Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 575, 102 S.Ct. 3245, 73 L.Ed.2d 973 (1982) ("[I]nterpretations of a statute which would produce absurd results are to be avoided if alternative interpretations consistent with the legislative purpose are available.").

Interpreting "types" of collateral to include the terms defined in Article 9 finds additional support in the official commentary. Comments to the general definitions section of former Article 9 state:

> For some purposes the Code makes distinctions between different *types of collateral* [such as] ... "goods" ... "accounts" and "general intangibles"....

13 PA. CONS.STAT. § 9105 cmt. 3 (1999) (emphasis added). Subsequent provisions explicitly refer to other terms listed in the general application sections as "type[s] of collateral." *See id.* § 9105 cmt. 4 (referring to the "type of collateral called 'chattel paper' "); *id.* § 9105 cmt. 5 (" 'Deposit account' is a type of collateral...."). Hence, the drafters expected "goods" and "accounts," and other categories of collateral defined in former Article 9, to constitute "types" of collateral as the phrase is used in section 9402. This evidence of legislative intent is particularly weighty when the plain meaning of the term provides little interpretive guidance. *See* 1 PA. CONS.STAT. §§ 1921–1922, 1939 (2002) (providing for use of legislative history and official comments in interpretation of Pennsylvania statutes); *Ross v. Hotel Em-*

ployees Int'l Union, 266 F.3d 236, 245 (3d Cir.2001) (relying on legislative history to construe ambiguous provision).

The court therefore holds that reference to the terms defined in former Article 9 of the U.C.C. satisfies the requirement of description by "type." *Accord Dillard Ford,* 940 F.2d at 1512; *In re Varney Wood Prods., Inc.,* 458 F.2d 435, 436–38 (4th Cir.1972); *see also Bennett Co.,* 588 F.2d at 392 (suggesting but not deciding that such descriptions are sufficient). The financing statement assigned to InterBusiness covers "goods" and "accounts." As defined in the U.C.C., "goods" include "inventory," *see* 13 Pa. Cons.Stat. § 9109(4) (1999), and "accounts" include "the ordinary commercial account receivable," *see id.* § 9106 cmt. Thus, reference to the "goods" and "accounts" of the debtor presumptively includes the inventory and accounts receivable of Annlick Farm Supply.

First National argues that, even if the references to "goods" and "accounts" suffice to cover inventory and accounts receivable, the financing statement assigned to InterBusiness includes additional limiting language that restricts the scope of the terms. *See, e.g., In re Toppo,* 474 F.Supp. 48, 51 (W.D.Pa.1979); *In re John Oliver Co.,* 91 B.R. 643, 645–46 (Bkrtcy.D.N.H. 1988); 4 White & Summers, *supra,* § 31.18. The statement refers to "[a]ll goods ... used, intended for use, or usable in the *construction, development, or operation of*

the Property" and to "all accounts ... relating to or arising from Debtor's ownership, construction, use, operation, leasing or sale *of all or any part of the Property.*" (Doc. 1, Ex. B (emphasis added)). First National asserts that the emphasized phrases demonstrate that the "goods" and "accounts" covered by the financing statement are limited to those relating directly to the property, such as the fixtures attached to the property (goods) or rents obtained through leasing of the premises (accounts).

The language cited by First National does not support such a restrictive interpretation. The first financing statement covers all goods and accounts arising from the "use" and "operation" of the property. The property, in this case, was the site of Annlick Farm Supply. By operating from and using this property to facilitate commercial transactions, Annlick Farm Supply was able to obtain assets in the forms of inventory and accounts receivable. The emphasized language, rather than aiding First National, actually supports the opposing position that the financing statement provided clear notice of a potential security interest in the collateral at issue.[11] *See* 13 Pa. Cons.Stat. §§ 9312 cmt. 5, 9402 cmt. 2 (1999); *In re Blue Ridge Motel Assocs.,* 106 B.R. 81, 82 (Bkrtcy.W.D.Pa. 1989). Through the financing statement, InterBusiness held a perfected and priority interest in the inventory and accounts receivable of Annlick Farm Supply.[12]

---

**11.** Further, accepting First National's argument would render the terms "accounts" and "goods" superfluous. Other provisions of the first financing statement expressly cover fixtures and other building materials used in the property, insurance on the property, compensation for the taking of the property, and "[a]ll rents, issues, income and profits of and from the Property and all leases, subleases and tenancies ... affecting said real estate." (Doc. 1, Ex. B). It would be unnecessary to include more generic references to "goods"

and "accounts" to cover the same assets. The more reasonable interpretation is that these terms cover a broader array of collateral than those relating solely to the real estate.

**12.** This result would likely not change under revised Article 9. *See* 13 Pa. Cons.Stat. § 9504 cmt. 2 (2002) ("[A]n indication of collateral that would have satisfied the requirements of former [Article 9] (i.e., 'a statement indicating the types, or describing the items, of collateral') suffices under [the revised Article]."); *see*

### C. *Satisfaction of the Underlying Debt*

That a party attains a priority perfected interest in collateral does not, of course, ensure that its right will remain undisturbed thereafter. Assignment or satisfaction of the underlying debt obligation extinguishes the party's security interest.[13] *See, e.g., Auerbach v. Corn Exch. Nat'l Bank & Trust Co.*, 148 F.2d 709, 711–12 (3d Cir.1945); *Savoy v. Beneficial Consumer Discount Co.*, 503 Pa. 74, 468 A.2d 465, 467–68 (1983). Satisfaction not only precludes enforcement of the security interest against the debtor, but also bars enforcement of priority rights against other creditors. Rights of priority against other creditors are grounded in, and dependent upon, rights of attachment against the debtor. 13 PA. CONS.STAT. §§ 9201(a), 9322, 9608(a), 9615(a) (2002); 1 CLARK, *supra*, ¶ 3.02; 4 WHITE & SUMMERS, *supra*, § 33–4. Without a security interest, there can be no priority interest.

First National suggests that the debt underlying InterBusiness's security interest in the collateral of Annlick Farm Supply was satisfied by operation of the Pennsylvania Deficiency Judgment Act, 42 PA. CONS.STAT. § 8103 (2002). The Act provides, in pertinent part, as follows:

(a) General rule.—Whenever any real property is sold ... to the judgment creditor in execution proceedings and the price for which such property has been sold is not sufficient to satisfy the amount of the judgment, interest and costs and the judgment creditor seeks to collect the balance due on said judgment, interest and costs, the judgment creditor shall petition the court to fix the fair market value of the real property sold. The petition shall be filed as a supplementary proceeding in the matter in which the judgment was entered [within six months following execution and delivery of sheriff's deed for the property sold in connection with the execution proceedings].

(b) Effect of failure to give notice.— Any debtor ... who is neither named in the petition nor served with a copy thereof or notice of the filing thereof as prescribed by general rule, shall be deemed to be discharged from all personal liability to the judgment creditor on the debt, interest and costs....

. . . . .

(d) Action in absence of petition.—If the judgment creditor shall fail to present a petition to fix the fair market value of the real property sold within [six months] after the sale of such real property ... the debtor ... may file a petition, as a supplementary proceeding in the matter in which the judgment was entered, in the court having jurisdiction, setting forth the fact of the sale, and that no petition has been filed within [six months after the sale of such real property] to fix the fair market value of the property sold, whereupon the court, after notice as prescribed by general rule, and being satisfied of such facts, shall

also *id.* § 9322(a)(1) ("Priority dates from the earlier of the time a filing covering the collateral is first made or the security interest ... is first perfected.").

**13.** *See* 13 PA. CONS.STAT. § 1201 (2002) (defining "security interest" as "an interest in personal property or fixtures which secures payment or performance *of an obligation*") (emphasis added); *id.* § 9203 (requiring "value" to be given for security interest to

attach); *id.* § 9513 (requiring secured party to file termination of financing statement when no debt obligation exists); *Carpenter v. Longan*, 83 U.S. (16 Wall.) 271, 275, 21 L.Ed. 313 (1872) (stating that security interest exists only with underlying debt); *In re Leisure Time Sports, Inc.*, 194 B.R. 859, 861 (9th Cir.BAP 1996) ("A security interest cannot exist ... independent from the obligation which it secures.").

direct the clerk to mark the judgment satisfied, released and discharged. *Id.; see also id.* § 5522. A judgment creditor that purchases real property of the debtor at an execution proceeding but fails to file a petition to fix value within six months thereafter is deemed to have accepted the purchase as full satisfaction of the judgment. *See id.* §§ 5522, 8103; *Marine Midland Bank v. Surfbelt, Inc.,* 718 F.2d 611, 613 (3d Cir.1983); *First Nat'l Consumer Discount Co. v. Fetherman,* 515 Pa. 85, 527 A.2d 100, 105 (1987).

██ It cannot reasonably be disputed that InterBusiness failed to comply with the Pennsylvania Deficiency Judgment Act. InterBusiness obtained judgment by confession against Annlick Farm Supply in a Pennsylvania trial court for sums owing under the first loan agreement and subsequently purchased the real property securing the debt at a sheriff's sale on May 1, 2003. Delivery of the deed triggered InterBusiness's obligation to file a petition to fix value within six months,[14] establishing the amount of debt satisfied by the purchase and the debt still remaining. InterBusiness did not file such a petition.

More difficult than finding non-compliance is determining its effect. Pennsylvania courts have consistently held that expiration of the six-month window gives rise to an "irrebuttable presumption that the creditor was paid in full in kind," but the superior court has recently suggested in dicta that this presumption is not "activate[d]" until the debtor files a petition to mark the judgment satisfied pursuant to

subsection (d) of the Act. *First Fed. Sav. & Loan Ass'n of Carnegie v. Keisling,* 746 A.2d 1150, 1158 (2000); *accord Commonwealth Bank & Trust Co. v. Hemsley,* 395 Pa.Super. 447, 577 A.2d 627, 631 (1990). *Compare* 42 Pa. Cons.Stat. § 8103(b) (2002) ("Any debtor ... who is neither named in the petition nor served with a copy thereof or notice of the filing thereof as prescribed by general rule, shall be deemed to be discharged from all personal liability to the judgment creditor on the debt ....") *with id.* § 8103(d) ("If the judgment creditor shall fail to present a petition to fix the fair market value ... within [six months] after the sale of such real property ... the debtor ... may file a petition ... to mark the judgment satisfied, released and discharged."). Neither Annlick Farm Supply nor another party filed a petition to mark the judgment satisfied in the state court execution proceedings. Therefore, only if the presumption of full satisfaction arises without action of the debtor or other parties is the debt owed to InterBusiness deemed satisfied for purposes of this case.

In *First National Consumer Discount Co. v. Fetherman,* 515 Pa. 85, 527 A.2d 100 (1987), the Supreme Court of Pennsylvania held that the Deficiency Judgment Act is self-executing. In *Fetherman,* the judgment creditor failed to file a petition to fix value within six months after the sale of the debtor's real property. *Id.* at 104. Thereafter, the debtor asked the creditor to enter the judgment satisfied of record, pursuant to Pennsylvania statutory provi-

---

**14.** Commencement of a bankruptcy action generally gives rise to an automatic stay of all proceedings against the debtor, including those relating to a petition to fix the value of the debtor's real estate pursuant to the Pennsylvania Deficiency Judgment Act. *See In re Wilkins,* 150 B.R. 127, 129 (Bkrtcy.M.D.Pa. 1992); *Citizens Nat'l Bank of Evans City v. Gold,* 439 Pa.Super. 254, 653 A.2d 1245, 1247–48 (1995). During the pendency of the action, the six-month limitations period for filing the petition is equitably tolled for the benefit of the judgment creditor until the automatic stay is lifted at the conclusion of the bankruptcy case. *See id.* However, because InterBusiness obtained relief from the automatic stay in order to act against the real property of Annlick Farm Supply, tolling is not warranted. *See id.*

sions requiring a "judgment creditor who *has received* satisfaction of any judgment[,] . . . at the written request of the judgment debtor, . . . [to] enter satisfaction in the office of the clerk of the court where such judgment is outstanding." 42 PA. CONS.STAT. § 8104(a) (2002) (emphasis added). When the judgment creditor refused to comply with the request, the debtor sought damages under the statute. *Fetherman*, 527 A.2d at 104; *see* 42 PA. CONS.STAT. § 8104(b) (2002) ("A judgment creditor who shall willfully or unreasonably fail without good cause or refuse . . . to comply with a request pursuant to subsection (a) shall pay to the judgment debtor . . . liquidated damages [in the amount specified hereunder].").

The supreme court held that the judgment creditor had a statutory duty to honor the debtor's request to mark the judgment satisfied after expiration of the six-month limitations period. *Fetherman*, 527 A.2d at 105. Even though the debtor had not filed a petition to mark the judgment satisfied, the court held that the judgment creditor's failure to file a timely petition to fix value immediately gave rise to the "irrebuttable presumption" that it had received full satisfaction of the debt. *Id.* at 103–05. Because the debt had been satisfied as of this time, the creditor was statutorily obliged to seek discharge of the judgment upon request of the debtor, and an award of damages was appropriate. *See id.*

Under the Pennsylvania Deficiency Judgment Act, as interpreted by the Supreme Court of Pennsylvania in *Fetherman*, InterBusiness's failure to file a petition to fix value within six months of the real estate sale conclusively establishes satisfaction of the debt owed by Annlick Farm Supply.[15] *See* 42 PA. CONS.STAT.

---

**15.** Although federalism principles require application of the *Fetherman* holding, *see Erie*, 304 U.S. at 79–80, 58 S.Ct. 817, the court would be remiss if it did not express reservations about its reasoning. These concerns follow inexorably from the plain meaning of the language of the Deficiency Judgment Act, which serves as the touchstone of construction. *See* 1 PA. CONS.STAT. § 1921(b); *Ramich*, 770 A.2d at 322. The statutory provisions strongly suggest that the presumption of satisfaction does not arise until a petition, either to fix value or to mark the judgment satisfied, is filed in the trial court proceedings. *Cf. First Fed. Sav. & Loan Ass'n of Carnegie v. Keisling*, 746 A.2d 1150, 1158 (2000) (suggesting that presumption is not "activate[d]" until the debtor files a petition to mark the judgment satisfied pursuant to subsection (d)). Subsection (b) of the Act deems a judgment against a debtor satisfied only when the creditor files a petition to fix value but fails to identify the debtor in the petition or to notify the debtor of the action. 42 PA. CONS.STAT. § 8103(b) (2002). Subsection (d) permits the state court to discharge an obligation in the absence of a timely petition to fix value by the creditor, but only after the debtor files a petition to mark the judgment satisfied. *Id.* § 8103(d). Neither subsection facially contemplates satisfaction of the debt in the absence of court action, whether prompted by a petition to fix value or to mark the judgment satisfied. This appears to be the more prudent course. It gives the state trial court, which has familiarity with and access to the underlying record of proceedings, the first opportunity to determine whether the judgment creditor did, in fact, fail to file the petition within six months of the sale date or whether the limitations period should be tolled for equitable or other reasons. *See id.* (requiring the state trial court, after a petition to mark the judgment satisfied is filed, *"and being satisfied of such facts,* [to] direct the clerk to mark the judgment satisfied, released and discharged") (emphasis added); *cf. supra* note 14 (noting tolling of period during bankruptcy proceedings against debtor). Nevertheless, the role of the federal court in diversity actions is application, not interpretation. *Erie*, 304 U.S. at 79–80, 58 S.Ct. 817; *Colantuno v. Aetna Ins. Co.*, 980 F.2d 908, 909 (3d Cir.1992). Whatever doubts are harbored over its reasoning, the state supreme court's construction of state law is entitled to solemn deference unless and until revisited by that tribunal. *West v. Am. Tel. & Tel. Co.*, 311 U.S. 223, 236, 61 S.Ct. 179, 85 L.Ed. 139 (1940); *see also Estate of Meriano v. Commissioner,*

§ 8103 (2002); *Fetherman*, 527 A.2d at 105; *see also Erie*, 304 U.S. at 79–80, 58 S.Ct. 817. Because both the mortgage agreement and the security agreement were based on this debt, its satisfaction extinguishes the security interest in the collateral now claimed by InterBusiness.

Nevertheless, InterBusiness claims that its security interest remains effective because the interests in the real property and collateral, although based on the same debt, arose through separate agreements. Such an argument elevates form over substance. *But see* 13 PA. CONS. STAT. § 9101 cmt. (1999) ("The scheme of the Article is to make distinctions, where distinctions are necessary, along functional rather than formal lines."); 4 WHITE & SUMMERS, *supra*, § 30–2 ("Substance generally reigns over form."). A security interest is effective only to the extent that the underlying debt obligation remains outstanding. *See Auerbach*, 148 F.2d at 711–12; *Savoy*, 468 A.2d at 467–68. Inter-Business's security interest in the collateral of Annlick Farm Supply was based entirely on the same debt underlying the mortgage agreement. When that debt was deemed satisfied by operation of the Pennsylvania Deficiency Judgment Act, the security interest in the collateral was extinguished. *See* 13 PA. CONS.STAT. §§ 1201, 9203, 9513 (2002);[16] *Auerbach*, 148 F.2d at 711–12; *Savoy*, 468 A.2d at 467–68. The formal existence of two separate agreements is immaterial to the substantive analysis of the validity of the security interest.

This principle also compels rejection of InterBusiness's proposed analogy to *Hor-bal v. Moxham National Bank*, 548 Pa. 394, 697 A.2d 577 (1997) (per curiam). In *Horbal*, an equally divided Supreme Court of Pennsylvania affirmed the lower courts' conclusion that a judgment creditor's failure to file a petition to fix value in accordance with the Pennsylvania Deficiency Judgment Act did not preclude the creditor from liquidating a certificate of deposit also held as security on the underlying debt. *Id.* at 578–79. InterBusiness seizes on this case for the proposition that noncompliance with the Act does not extinguish the creditor's right to enforce "separate" agreements providing "additional" security on the same debt.

Neither the supreme court nor the lower court opinions in *Horbal* stand for the holding espoused by InterBusiness. To the contrary, the outcome in *Horbal* hinged on the conclusion (accepted by three justices of the supreme court) that the certificate of deposit was a negotiable instrument controlled by Article 3, rather than Article 9, of the U.C.C. *See id.* at 582–83; *see also id.* at 585 (opinion in support of reversal). From this conclusion, the justices reasoned that the instrument was effective to transfer *full ownership rights* to the creditor *on the date of default. Id.* at 583–84. The certificate of deposit, and the funds that it represented, ceased to be the personal property of the debtor and became the property of the creditor immediately upon default, regardless of when the creditor actually liquidated the certificate. *Id.* The subsequent satisfaction of the underlying debt by operation of the Deficiency Judgment Act eliminated the creditor's right to enforce

---

142 F.3d 651, 659 (3d Cir.1998) ("[The] determination of [Pennsylvania law] turns on the pronouncements of Pennsylvania's highest court, not its Superior Court."); *cf. Horbal v. Moxham Nat'l Bank*, 548 Pa. 394, 697 A.2d 577, 581–82, 586 (1997) (citing *Fetherman* with approval).

16. Because the security interest was extinguished after the effective date of revised Article 9, the amended provisions govern these issues of perfection and priority. *See* 13 PA. CONS.STAT. § 9709(a) (2002).

the debt obligation. *Id.* But, according to the court, it did not affect the creditor's ability to liquidate the certificate of deposit, which it "owned" upon the debtor's default. *Id.*

Unlike *Horbal*, InterBusiness seeks to enforce a security interest concededly governed by Article 9. Neither party asserts, nor could they, that the security agreement at issue is a "negotiable instrument" or that this case somehow implicates Article 3 of the U.C.C. *See id.* at 583–86 (explaining requisites for negotiable instruments). Ownership of the collateral did not pass immediately upon default from Annlick Farm Supply to InterBusiness; rather, InterBusiness gained a right to enforce a security interest in that property. *Cf.* 13 Pa. Cons.Stat. §§ 9611, 9624(a) (2002) (providing debtors a right to notification before disposition of collateral by secured party). As discussed previously, this interest was premised on a debt that was subsequently satisfied by operation of the Deficiency Judgment Act. Thereafter, the security interest was extinguished.

InterBusiness has received the relief that it requests, and its claim for these amounts is now moot. While a finding of mootness would ordinarily compel dismissal of the claims, or the entire case, such action would be premature in this circumstance. *See* 5A Wright & Miller, *supra,* § 3533.2. First National did not move for summary judgment on grounds of satisfaction. Rather, it raised the issue only as a defense to InterBusiness's motion. Finding the debt satisfied by operation of Pennsylvania law rests on a view of the facts in the light most favorable to First National, as the non-moving party, and the issue has received inadequate briefing to permit final resolution.[17] *See* 10A Wright

et al., *supra,* § 2720; *see also supra* Part II (explaining cross-motion practice). Considering the record at this stage of the proceedings, the court can conclude only that InterBusiness is not entitled to judgment as a matter of law.

## IV. *Conclusion*

Both InterBusiness and First National acquired valid and enforceable perfected interests in the inventory and accounts receivable of Annlick Farm Supply through the assignment of interests from Allied Capital. First National violated InterBusiness's priority status under Article 9 of the U.C.C. by collecting and liquidating those assets, but evidence suggests that InterBusiness subsequently obtained full satisfaction of its debt by operation of the Pennsylvania Deficiency Judgment Act. Because material questions of fact with respect to the validity of plaintiff's claims remain outstanding, the cross-motions for summary judgment and the motion to dismiss must be denied.

An appropriate order will issue.

### *ORDER*

AND NOW, this 23rd day of April, 2004, upon consideration of the cross-motions for summary judgment of plaintiff and defendant (Docs. 13, 20) and the motion to dismiss of third-party defendants (Doc. 10), and for the reasons stated in the accompanying memorandum, it is hereby ORDERED that the motions (Docs. 10, 13, 20) are DENIED.

---

**17.** In addition, outstanding claims for punitive damages by InterBusiness still remain and present a live "case or controversy" regardless of the extinguishment of the security interest. *See* U.S. Const. art. III, § 2; 5A Wright & Miller, *supra,* § 3533.2 (discussing mootness and "case or controversy" requirement).