William GROVE, Sr, Virginia B. Grove, Sandra Palmieri, Michael G. Fuhrman, William Winter, Preston Himes, and Edward Myers, on behalf of themselves; and Floyd Mitzel, Maurice Kefauver, III, Harold G. Luckenbaugh, Wilmer C. Barrett, Larry Lehman, Gerald A. Young, and John C. Douglass, on behalf of themselves and others similarly situated; and International Union United Automobile, Aerospace and Agricultural Implement Workers of America, Plaintiffs

v.

JOHNSON CONTROLS, INC, Johnson Controls, Inc. Union Retiree Welfare Plan (Plan 570), Johnson Controls, Inc. Union Welfare Plan (Plan 565), and Does 1 through 20, Defendants.

Civil No. 1:12-CV-02622

United States District Court, M.D. Pennsylvania.

Signed March 31, 2016

458

Tybe A. Brett, Joel R. Hurt, McKean J. Evans, Pamina G. Ewing, Stephen M. Pincus, Feinstein Doyle Payne & Kravec, LLC, Pittsburgh, PA, William T. Payne, Feinstein Doyle Payne & Kravec, LLC, Aspinwall, PA, for Plaintiffs.

Alan R. Boynton, Jr., Brian F. Jackson, McNees, Wallace & Nurick, Harrisburg, PA, Bernard J. Bobber, Ogletree, Deakins, Nash, Smoak & Stewart, P.C., Milwaukee, WI, John F. Birmingham, Foley & Lardner LLP, Detroit, MI, Larry S. Perlman, Foley & Lardner LLP, Miami, FL, for Defendants.

## MEMORANDUM

Sylvia H. Rambo, United States District Judge

In this civil action brought pursuant to the Employee Retirement Income Security

Act ("ERISA"), 29 U.S.C. § 1001, and the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 141, Plaintiffs allege that Defendants violated their rights to retiree health benefits. Presently before the court are the parties' cross-motions for summary judgment (Docs. 95 & 97), as well as Plaintiffs' motion to strike Defendants' objections to certain paragraphs of Plaintiffs' statement of material facts (Doc. 105). Upon consideration of the motions and for the reasons discussed herein, the court will deny Plaintiffs' motion to strike and partial motion for summary judgment and will grant Defendants' motion for summary judgment in its entirety.

## I. Background

Plaintiffs Floyd Mitzel, Maurice Kefauver III, Harold G. Luckenbaugh, Wilmer C. Barrett, Larry Lehman, Gerald A. Young, and John C. Douglass ("Class Representatives") filed this action on be half of themselves and similarly-situated groups of retirees ("Retirees"), including the additional individually-named Plaintiffs, who were previously represented by Plaintiff International Union United Automobile, Aerospace and Agricultural Implement Workers of America ("UAW") and its Local Union No. 1872 (together with UAW, the "Union"). (Doc. 85, ¶ 1.) By order dated December 3, 2014, the court certified six subclasses of plaintiffs, denoted as Subclasses A, B, C, D, E and F, grouping retirees into these subclasses based on their respective dates of retirement. (Doc. 88, pp. 8-10 of 10.) In that order, the court appointed Plaintiff Douglass as Class Representative for Subclass A; Plaintiff Young as Class Representative for Subclass B; Plaintiff Kefauver as Class Representative for Subclass C; Plaintiffs Luckenbaugh and Barrett as Class Representatives for Subclass D; Plaintiff Mitzel as Class Representative for Subclass E; and Plain tiff Lehman as Class Representative for Subclass F. (Id.)

Defendant Johnson Controls, Inc. ("Johnson Controls" or, with its predecessors in interest, "the Company"), is a Wisconsin corporation engaged in the business of manufacturing products and offering services related to energy and operational efficiency of buildings, automotive batteries, electronics, and interior systems for automobiles. (Doc. 95-1, ¶ 9.) Since 2005, Johnson Controls has operated a manufacturing plant in York, Pennsylvania (the "York Plant") after acquiring it from York International Corporation ("York International") via a merger. (Id.) Defendants Johnson Controls, Inc. Union Retiree Welfare Plan and Johnson Controls, Inc. Union Welfare Plan (collectively, the "Plan") are employee benefit plans within the meaning of ERISA. (Id. at ¶ 12.)

Every few years since 1973, the Union has negotiated a collective-bargaining agreement ("CBA") with Johns on Controls or its predecessors relating to, *inter alia*, active and retiree health insurance benefits for both employees and former employees of the York Plant. (Doc. 95-1, ¶ 17.) Each CBA incorporated by reference a separate booklet, the "Group Insurance Program" ("GIP"), that specifically addressed health and welfare benefits. Throughout the years, these health benefits remained fairly consistent from agreement to agreement. However, in 2009, Johnson Controls unilaterally reduced retiree health benefits by instituting a $50,000.00 lifetime cap on benefits payable for each participant sixty-five years of age and older. (Doc. 95-1, ¶ 15.) As a result of the cap, some subclass members are no longer eligible for retiree healthcare benefits because they have reached the $50,000 lifetime coverage limit. (Id. at ¶16.)

### A. The Agreements

The relevant CBAs in effect at the time the members of each subclass retired are set forth in detail below.

## 1. Subclass A

The CBAs and GIPs in effect prior to November 1, 1984 govern Subclass A, the members of which retired prior to this date.

### a. The 1973, 1975, and 1978 CBAs

Beginning in 1975, the CBAs negotiated between the Union and the Company provided for health and welfare benefits through an insurance program that was described in the corresponding GIP. Article 35 of each CBA incorporated the GIP by reference "subject to all provisions of this Agreement." (*See, e.g.*, Doc. 97-9, p. 125 of 169.) One such provision was the durational clause appearing in Article 37, which set forth the plan effective date and termination date. For instance, the 1973's durational clause provided as follows:

> This Agreement shall become effective as of November 1, 1973 and shall remain in full force and effect until midnight October 31, 1975 and shall continue from year to year thereafter, unless at least sixty (60) days prior to November 1, 1975 either party gives written notice to the other of their intention to modify or terminate same.

(Doc. 97-4, p. 100 of 129.) With each new CBA, the parties would publish a new GIP to correspond with the effective period of that particular CBA.

### b. The 1981 CBA

Similar to earlier versions of the CBA, the durational clause of the 1981 CBA provided as follows:

> This Agreement shall become effective as of November 1, 1981 and shall remain in full force and effect until midnight October 31, 1984, and shall continue from year to year thereafter, unless at least sixty (60) days prior to November 1, 1984, either party gives written notice to the other of their intention to modify or terminate same.

(Doc. 97-9, pp. 142-43 of 195.) The CBA incorporated the 1981 GIP by reference:

> The parties have provided for a Group Insurance Program in a separate booklet which is part of this Agreement as if set out in full herein, subject to all provisions of this Agreement.

(Doc. 97-9, p. 142 of 195.) As to medical benefits, the 1981 GIP stated, in pertinent part:

> Employees who retire under the Normal, Early, or Disability Retirement Provisions of York Pension Plan No. 4 and their eligible dependents *shall have the following benefits (as described in this booklet) continued* after retirement at no cost:
>
> -Hospital Expense Benefits
>
> -Surgical Expense Benefits
>
> -Medical Expense Benefits
>
> -Diagnostic X-Ray & Laboratory Benefits
>
> -Prescription Drug Benefits
>
> **Benefits NOT Continued After Retirement**
>
> Upon retirement, employees will no longer be insured for Accidental Death and Dismemberment, Survivor Income, Accident and Sickness, Long Term Disability, Vision Care or Dental Benefits.

(*Id.* at p. 69 of 79 (emphasis added).)

## 2. Subclass B

The CBAs and GIPs in effect from November 1, 1984 to October 31, 1996 govern the members of Subclass B, who re tired between those dates. The relevant provisions of those documents are provided below.

### a. The 1984 and 1987 CBAs

As with prior versions, the 1984 CBA was effective from November 1, 1984 until midnight October 31, 1987 (Doc. 97-11, p. 97 of 141), and incorporated a GIP in a

separate booklet "as if set out in full" therein (*id.*). The 1984 GIP contained provisions related to termination of health coverage as follows:

### Termination of Insurance

Your health insurance is continued *until your death*—unless you request termination of insurance or you do not make the required contribution for this plan. And your dependents' health insurance *will be continued—while you are living—until the date they no longer qualify as your eligible dependent*, or until you request termination of dependent coverage or do not make the required contributions.

### Continuation of coverages for your survivors

If you die after retirement, health coverage may be continued for your spouse and children, provided the required contributions are paid. . . .

Your spouse will remain eligible *until the earlier of death or remarriage*. Your children will remain eligible until your spouse is no longer eligible, or the children are no longer eligible (due to age, marriage, etc.), whichever is earlier.

### Plan termination

In the event this group plan is terminated, coverage for you and your dependents will end immediately.

(Doc. 97-12, pp. 94-95 of 175 (emphasis added.) The 1984 GIP further stated that there was no overall limit on medical cove rage or a lifetime maximum under the Plan. (*Id.* at p. 88 of 175.) The 1984 GIP, however, did set a $15,000 lifetime limit "for combined mental and nervous conditions, psychiatric disorders, alcoholism and drug abuse expenses of each individual." (*Id.*) In addition, retirees under the age of sixty-five were required to pay a $15.50 monthly contribution toward their health benefits, but the requirement was waived for retirees over sixty-five years of age. (*Id.* at p. 93 of 175.) The 1984 GIP also

included a section entitled "Future of the Plans," which reads:

Although the company expects and intends to continue the plan indefinitely, it reserves the right to modify, amend, suspend or terminate them at any time.

(*Id.* at p. 162 of 175.)

Similar to the 1984 CBA, the 1987 CBA set forth a specific duration of effectiveness—November 1, 1987 to October 31, 1990—and incorporated the 1987 GIP booklet by reference "subject to all provisions of this Agreement." (Doc. 97-13, p. 103-04 of 153.) The overall lifetime limit remained "none," while the maximum payment "for combined mental and nervous conditions, psychiatric disorders, alcoholism and drug abuse" increased to "$25,000 per lifetime effective January 1, 1988." (Doc. 97-14, p. 88 of 153.) Monthly contributions by retirees under age sixty-five also increased to $17.90. (*Id.* at p. 93 of 163.) The 1987 GIP described the termination of retiree medical benefits identically to the 1984 GIP provisions. (*Id.* at pp. 93-94 of 163.) Finally, the 1987 GIP contained a "Future of the Plans" clause providing that, "[a]lthough the company expects and intends to continue the plans indefinitely, the Company reserves the right to modify, amend, suspend or terminate the plans at any time." (*Id.* at p. 150 of 163.)

### b. The 1990 and 1993 CBAs

The 1990 and 1993 CBAs included durational clauses and incorporated corresponding GIPs. (Doc 97-15, p. 103-04 of 157; Doc. 97-17, p. 103-04 of 159.) Both GIP booklets contained the same termination of coverage clauses that continued health benefits until death, excerpted above for the 1984 GIP, along with identical "Future of the Plans" clauses reserving the Company's right to "modify, amend, suspend or terminate the plans at any time." (Doc. 97-16, p. 81, 122 of 130; Doc.

97-18, p. 81, 122 of 130.) No changes were made to the overall lifetime maximum plan payments, but the amount "for [the] combined mental and nervous conditions, psychiatric disorders, alcoholism and drug abuse expenses of each individual" was raised to $30,000 per lifetime. (Doc. 97-16, p. 77 of 130; Doc. 97-18, p. 77 of 130.)

### 3. Subclasses C, D, and E

The members of Subclasses C, D, and E are governed by the 1996, 2000, and 2003 CBAs and GIPs, respectively.

#### a. 1996 CBA

The 1996 CBA was in effect from July 1, 1996 until June 30, 2000 (Doc. 97-19, p. 103 of 161), and, as with all previous versions, incorporated its GIP "in a separate booklet" (*id.* at p. 102 of 161). Beginning in 1996, however, the parties departed from the customary practice of producing one GIP booklet and instead published two: one for active employees and another for retirees.

The 1996 GIP for active employees expressly reserved for the Company the right to "modify, amend, suspend or terminate the benefits plan." (*Id.* at p. 93 of 97.) This language, however, was absent from the GIP booklet for retirees.

The 1996 GIP retiree booklet did, however, provide the following terms regarding retiree benefits and termination:

#### 1.14 Conversion to an individual health insurance policy

When your group cove rage terminates, you may apply for an individual health policy without having to prove good health....

#### 1.15 Termination of Coverage

Your coverage is continued *until your death*—unless you request termination of coverage or you do not make the required contribution for this plan.

And your dependents' health coverage *will be continued—while you are living—until the date they are no longer qualified as your eligible dependents*, or you request termination of dependent coverage or do not make the required contributions.

#### 1.16 Continuation of coverage for your survivors

If you die after retirement, health coverage may be continued for your spouse and children, provided the required contributions are paid....

Your spouse will remain eligible *until the earlier of death or remarriage.* Your children will remain eligible until your spouse is no longer eligible, or the children are no longer eligible (due to age, marriage, etc.), whichever is earlier.

#### 1.17 Plan Termination

In the event this group is terminated, coverage for you and your dependents will end immediately.

(Doc. 97-21, pp. 11-12 of 51 (emphasis added).) The retiree booklet further provided that there was "no overall limit on how much the plan will pay for one person's medical bills." (*Id.* at p. 15 of 51.)

#### b. The 2000 CBA

The 2000 CBA between the Company and the Union was in effect from July 1, 2000 until June 30, 2003 and again incorporated a separate GIP. (Doc. 97-22, p. 98-99 of 173.) As in the previous CBA, the parties published separate GIP booklets for employees and retirees. The active employee GIP booklet reserved to the Company "the right to modify, amend, suspend or terminate the Plans at any time," (Doc. 97-23, p. 89 of 93), while the retiree booklet contained no such clause.

Instead, the retiree booklet supplied identical terms to the 1996 GIP retiree booklet regarding the duration and termination of benefits. (Doc. 97-24, pp. 10-11 of 50.) In addition to the 1996 GIP retiree booklet, however, the 2000 retiree GIP booklet provided retirees with additional

coverage if they sought treatment from a preferred provider. (*Id.* at pp. 13-14 of 50.) The 2000 GIP retiree booklet also added a wellness benefits section absent from previous editions. (*Id.* at pp. 19-22 of 50.) The booklet contained no overall lifetime limit for plan coverage of medical bills. (*Id.* at pp. 13, 15 of 50.)

### c. The 2003 CBA

The 2003 CBA was in effect from July 1, 2003 until July 30, 2006. (Doc. 97-25, pp. 112-13 of 184), and incorporated a separate GIP booklet subject to all provisions of the CBA (*id.* at pp. 112-13 of 184). Once again, the Plan provided separate GIP booklets for employees and retirees. The 2003 GIP active employee booklet conferred upon the Company "the right t o modify, amend, suspend or terminate" any plans. (Doc. 97-26, p. 89 of 93.) The retire booklet, however, did not contain a similar clause.

The 2003 GIP retiree booklet contained identical term s to the previous two GIP retiree booklets regarding the duration of benefits, their termination, and potential conversion to an individual health insurance policy. (Doc-97-27, pp. 12-13 of 55.) No maximum lifetime limits were set as to how much the Plan would pay toward an individual's medical bills. (*Id.* at pp. 15, 17 of 55.)

### 3. Subclass F

The CBA in effect from July 31, 2006 to July 31, 2009 ("2006 CBA") governs the insurance benefits for Subclass F, the members of which retired between those dates.

The 2006 CBA, which was the first with Johnson Controls as the employer of the York Plant employees, provided a durational clause and separate GIP booklet. (Doc. 97-28, pp. 106-09 of 175.) For the first time in many years, however, only one GIP booklet was provided.

Unlike previous versions, the GIP booklet stated on its cover that it was a "Summary Plan Description." (Doc. 97-29.) On the first page, in the initial section entitled "INTRODUCTION," the document confirmed the Company's right to amend or terminate the benefits plans, stating:

**Reminder: Employer's Right to Amend or Terminate the Plans.** While the Summary Plan Description summarizes the main terms and conditions of the Johns on Controls employee benefits program, please remember that Johnson Controls, Inc. reserves the right to amend or terminate the benefits program or any portion of it at any time by action of the Policy Committee or the Board of Directors either as a result of collective bargaining requirement or at the expiration of the collective bargaining agreement with the union.

(*Id.* at p. 3 of 108.) The 2006 Summary Plan Description also addressed termination of benefits for retirees as follows:

**WHEN COVERAGE ENDS**

Generally, your participation in the Group Benefits Program for Retired Employees ends on the date of your death unless you request termination of coverage or when you cease to make the required contributions for this plan. Your dependents' coverage ends at the same time your participation ends, or when your dependent ceases to qualify as an eligible dependent, if earlier.

Once enrolled, you may discontinue coverage for yourself or dependents at any time upon written notification to [the] Benefits Service Center.

If you die after retirement, medical plan cove rage may be continued for your eligible dependents (spouse and/or child(ren)), provided the required contributions are paid in a timely manner. To qualify for continued coverage, your spouse must have been married to you for at least one year at the time of your death. Your spouse will remain eligible

for continued benefits until the earlier of death or remarriage. Your dependent children will remain eligible until your spouse is no longer eligible or the children are no longer eligible (due to age, marriage, etc.), whichever is earlier.

(*Id.* at p. 79 of 108.) The 2006 Summary Plan Description also contained a separate provision detailing the Company's right to amend or terminate the benefits at any time as follows:

### PLAN AMENDMENT OR TERMINATION

The company reserves the right to amend or terminate the benefits program or any portion of it at any time by action of the Policy Committee or Board of Directors.... The company's right to amend the benefits program includes, but is not limited to, changing the amounts required to be contributed by the company and/or the employee for the purchase of benefits, level of benefits provided and the class or classes of employees eligible to participate.

(*Id.* at p. 105 of 108.)

In addition to the reservation of rights clauses, the 2006 Summary Plan Description removed the unlimited lifetime benefits available to retirees and introduced "a post-65, individual, non-reinstatable maximum lifetime limit of $500,000 on medical plan (including prescription drug) claims paid under the plan."[1] (*Id.* at p. 79 of 108.) While retirees over sixty-five years of age did not have to make monthly contributions, those under that threshold faced significant increases. If the former employees retired before February 1, 2004—during which the 2003 CBA theoretically controlled—monthly contributions remained at $17.90. (*Id.*) Employees retiring after February 1, 2004, however, were required to pay $65 per month, with the cost increasing approximately ten dollars each

year for the time remaining under the 2006 CBA. (*Id.* at p. 80 of 108.) Finally, while previous GIPs had required only ten years of service to become eligible for employee benefits, the 2006 Summary Plan Description required "ten or more years of continuous service" and that the individual had been "a full-time regular union employee hired prior to April 1, 1985." (*Id.* at p. 71 of 102.)

### B. Procedural Background

Plaintiffs commenced this action by filing a complaint on December 31, 2012 (Doc. 1), followed by an amended complaint on March 21, 2013 (Doc. 27), after each individual plaintiff had exceeded the plan benefits cap and had his or her benefits terminated. Plaintiffs' first amended complaint brought the following counts: (1) Count I—Violation of Labor Agreements Actionable under Section 301 of the LMRA against all Defendants; (2) Count II—Violation of Employee Welfare Benefit Plan Actionable under Section 502 of ERISA against all Defendants; (3) Count III—Breach of Fiduciary Duty under ERISA Section 404 and 502 against Defendant Johnson Controls; and (4) Count IV—Equitable Estoppel under ERISA and LMRA Section 301 against all Defendants. (*See generally id.*) Plaintiffs requested declarative, equitable, and injunctive relief as well as an award of attorneys' fees. (*Id.*, Prayer for Relief, ¶¶ B-I.) After Defendants moved to dismiss Plaintiffs' claim in their entirety, the court issued an order dated June 17, 2013 denying the motion as to the first three counts, but dismissing the equitable estoppel claim. (Doc. 42; *see Grove v. Johnson Controls, Inc.*, Civ. No. 12–cv–2622, 2013 WL 3049114 (M.D.Pa. June 17, 2013)). On June 10, 2015, Plaintiffs withdrew "their claim for breach of fiduciary duty" or Count III—Breach of Fiduciary

---

1. Johnson Controls, Inc. later instituted a $50,000 lifetime benefit maximum on retiree

benefits which prompted this litigation. (Doc. 85, ¶ 4; Doc. 87, ¶ 4.)

Duty under ERISA §§ 404 and 502 against Defendant Johnson Controls. (Doc. 102, p.4 n.5 of 43.)

On August 2, 2013, Wilmer C. Barrett and the Union filed a related class action complaint regarding the same underlying issues. *See Barrett v. Johnson Controls, Inc.*, Civ. No. 13–cv–2071, Doc. 1 (M.D.Pa. Aug. 2, 2013). By order dated October 10, 2013, the court consolidated *Barrett,* into the captioned action. Thereafter, Plaintiffs in the consolidated cases filed a Second Amended Complaint (Doc. 54), which reflected the consolidation of these actions by merging *Barrett*'s class action allegations (*see Barrett* Doc. 1) into *Grove*'s operative First Amended Complaint (*see* Doc. 27), with *Grove*'s individual plaintiffs acting as the putative class representatives. Plaintiffs then filed their Fourth Amended Complaint on October 28, 2014. (Doc. 79.) By order dated December 3, 2014, the court certified Subclasses A, B, C, D, E, and F, grouping retirees into subclasses based on date of retirement. (Doc. 88.)

On April 29, 2015, Plaintiffs filed a motion for partial summary judgment (Doc. 95) and a brief in support (Doc. 96) as t o Subclasses C, D, and E. On May 20, 2015, Defendants filed a response to Plaintiffs' motion for partial summary judgment and a cross-motion for summary judgment (Doc. 97), along with a brief in support (Doc. 99), as to all of Plaintiffs' claims. Plaintiffs filed a brief in opposition to Defendants' motion for summary judgment and a reply to Defendants' response on June 10, 2015. (Doc. 102.) On July 1, 2015, Defendants filed a reply to Plaintiffs' opposition. (Doc. 108.) On June 6, 2015, Plaintiffs filed a motion to strike objections to and deem admitted certain paragraphs of Plaintiffs' statement of material facts. (Doc. 105.) On June 29, 2015, Defendants filed an opposition to the motion to strike

(Doc. 107), and Plaintiff replied on July 16, 2015 (Doc. 109).

Thus, this matter has been fully briefed and is ripe for disposition.

## II. Plaintiffs' Motion to Strike

█ Plaintiffs' motion to strike challenges the admissibility of certain evidentiary challenges relied upon in Defendants' response to Plaintiffs' statement of undisputed facts in support of their motion for partial summary judgment. Plaintiff contends that the facts Defendants challenge are properly supported with admissible evidence and that Defendants failed to cite any evidence showing these facts are genuinely disputed.

█ Under Local Rule 56.1, a motion for summary judgment requires a party to file an accompanying "short and concise statement of the material facts." A party may then "object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). Generally, motions to strike attack pleadings that present "an insufficient defense or any redundant, immaterial, impertinent or scandalous matter." Fed. R. Civ. P. 12(f). In practice, this court has entertained motions to strike attacking the opposing party's statements of material fact or supporting affidavits. *See, e.g., York Int'l Corp. v. Liberty Mut. Ins. Co.*, Civ. No. 10–cv–0692, 2015 WL 4162981 (M.D.Pa. July 9, 2015); *Gloria Lytle v. Capital Area Intermediate Unit*, Civ. No. 05–cv–0133, 2009 WL 82483 (M.D.Pa. Jan. 9, 2009). While a party may hope to exclude its opponent's material facts due to their potential inadmissibility at trial, legal arguments, however, may not be excluded.

Here, Plaintiffs attempt to strike Defendants' legal arguments disputing the introduction of twenty-three paragraphs of Plaintiffs' material facts. Because the court

finds that a motion to strike is an in appropriate vehicle in which to attack an opposing party's legal argument in response to a statement of material facts, the motion will be denied.

### III. Cross-motions for Summary Judgment

In considering the instant motion for summary judgment, the court relied on the uncontested facts or, if the facts were disputed, viewed the facts and deduced all reasonable inferences therefrom in the light most favorable to the nonmoving party. *See Doe v. C.A.R.S. Prot. Plus*, 527 F.3d 358, 362 (3d Cir.2008).

### A. Legal Standard

Summary judgment is proper when the record, taken in its entirety, shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Heffernan v. City of Paterson*, 777 F.3d 147, 151 (3d Cir.2015). "An issue is genuine only if there is a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party, and a factual dispute is material only if it might affect the outcome of the suit under governing law." *Kaucher v. Cty. of Bucks*, 455 F.3d 418, 423 (3d Cir.2006) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). The court must "view the record in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor." *Thomas v. Cumberland Cty.*, 749 F.3d 217, 222 (3d Cir.2014) (citing *Bowers v. Nat'l Collegiate Athletic Ass'n*, 475 F.3d 524, 535 (3d Cir.2007)). However, the "court may not make credibility determinations or engage in any weighing of the evidence." *Montone v. City of Jersey City*, 709 F.3d 181, 191 (3d Cir.2013) (quoting *Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir.2004)).

The moving party bears the initial burden to show an "absence of a genuine issue of material fact." *Santini v. Fuentes*, 795 F.3d 410, 416 (3d Cir.2015) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). If the moving party satisfies its burden, the burden shifts to the non-moving party to "go beyond the pleadings" and "designate specific facts showing that there is a genuine issue for trial." *Guidotti v. Legal Helpers Debt Resolution, L.L.C.*, 716 F.3d 764, 773 (3d Cir.2013) (quoting *Celotex Corp.*, 477 U.S. at 324, 106 S.Ct. 2548).

"A party's failure to make a showing that is 'sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial[,]' mandates the entry of summary judgment." *Watson v. Eastman Kodak Co.*, 235 F.3d 851, 857–58 (3d Cir.2000) (quoting *Celotex Corp.*, 477 U.S. at 322, 106 S.Ct. 2548). A court should also grant summary judgment when the party's evidence "is merely colorable or is not significantly probative." *DeHart v. Horn*, 390 F.3d 262, 267–68 (3d Cir.2004) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). In sum, an opposing party must provide more "than some metaphysical doubt as to the material facts." *Chavarriaga v. New Jersey Dept. of Corr.*, 806 F.3d 210, 218 (3d Cir.2015).

Although it can present a "formidable task," the court is permitted to resolve concurrent cross-motions for summary judgment. *InterBusiness Bank, N.A. v. First Nat'l Bank of Mifflintown*, 318 F.Supp.2d 230, 235 (M.D.Pa.2004) (citing 10A Charles Alan Wright et al., FED. PRACTICE & PROCEDURE § 2720 (3d ed. 1998)). Nonetheless, "the rule is no different where there are cross-motions for summary judgment." *Lawrence v. City of Phila., Pa.*, 527 F.3d 299, 300 (3d Cir.2008). "Inferences to which a party is entitled

with respect to the opponent's motion may not be granted with respect to its own." *Falls v. State Farm Ins. Mut. Auto Ins. Co.*, 774 F.Supp.2d 705, 709 (M.D.Pa.2011) (quoting *InterBusiness Bank, N.A.*, 318 F.Supp.2d at 236).

## B. Welfare Benefits under the LMRA and ERISA

■ Plaintiffs assert their claims under the LMRA and ERISA for welfare benefits denied to them through alleged violations of benefit plans. When disputes arise between employers and labor unions pursuant to a collective bargaining agreement, the LMRA grants federal courts jurisdiction to resolve them. 29 U.S.C. § 185(c). Under ERISA, plan beneficiaries may bring civil actions "[t]o recover benefits due to [them] under the term s of [the] plan, to enforce [their] rights under the terms of the plan, or to clarify [their] rights to future benefits under the terms of the plan." 29 U.S.C § 1132(a)(1)(B). ERISA, however, distinguishes between pension and welfare benefit plans. *Int'l Union, United Auto., Aerospace and Agric. Implement Workers of Am., U.A.W. v. Skinner Engine Co.*, 188 F.3d 130, 137 (3d Cir.1999). Although ERISA directs welfare plans to be "maintained pursuant to a written instrument," 29 U.S.C. § 1102(a)(1), employers re main "generally free under ERISA, for any reason at any time, to adopt, modify or terminate welfare plans." *M & G Polymers USA, LLC v. Tackett*, —— U.S. ——, 135 S.Ct. 926, 933, 190 L.Ed.2d 809 (2015) (citing *Curtiss–Wright Corp. v. Schoonejongen*, 514 U.S. 73, 78, 115 S.Ct. 1223, 131 L.Ed.2d 94 (1995)). Plan participants therefor e bear "the burden of proving, by a preponderance of the evidence, that the employer intended the welfare benefits to be vested." *Skinner*, 188 F.3d at 138–39 (quoting *In re Unisys Corp. Retiree Med. Benefit "ERISA" Litig.*, 58 F.3d 896, 901 (3d Cir. 1995)).

## C. Vesting of Welfare Benefits

■ The United States Supreme Court recently held that, in determining whether an employer intended to vest welfare bene fits, courts must "interpret collective bargaining agreements, including those establishing ERISA plans, according to ordinary principles of contract law, at least when those principles are not inconsistent with federal labor policy." *Tackett*, 135 S.Ct. at 933 (citing *Textile Workers v. Lincoln Mills of Ala.*, 353 U.S. 448, 456–57, 77 S.Ct. 912, 1 L.Ed.2d 972 (1957)). Plaintiffs and Defendants disagree as to what impact the Supreme Court's decision in *Tackett* generated on the Third Circuit's holding in *Skinner*, which requires "an employer's commitment to vest [ERISA] benefits...[to] be stated in *clear and express language*." 188 F.3d at 139 (emphasis added).

In *Skinner*, after a series of CBAs were negotiated between the parties over the course of twenty years, the defendant retroactively modified or terminated life and health insurance benefits for former employees who had retired prior to the effective date of the most recent CBA. *Id.* at 134–36. The plaintiffs challenged the disruption of their benefits, arguing that specific language in the CBAs denoting that the benefits "will continue" and "shall remain," had vested lifetime benefits during each of the previous CBAs. *Id.* at 140.

In part, the plaintiffs in *Skinner* urged the Third Circuit to adopt the Sixth Circuit's presumption "that the parties [to a CBA] intend[ ] retiree welfare benefits to continue for life, notwithstanding the expiration of a collective bargaining agreement." *Id.* at 140 (citing *Int'l Union, United Auto., Aerospace, & Agric. Implement Workers of Am. v. Yard–Man, Inc.*, 716 F.2d 1476, 1482–83 (6th Cir.1983)). The dispute in *Yard–Man*, as in *Skinner*, arose from the termination of benefits for retir-

468

ees at the expiration of a CBA. *Skinner*, 188 F.3d at 139. When faced with the specific CB A provision at issue stating that "the Company *will provide insurance benefits equal to the active group benefits*...for the former employee and his spouse," the *Yard–Man* court found the italicized phrase ambiguous. *Id.* at 139 (quoting *Yard–Man*, 716 F.2d at 1480–81). After reviewing other provisions of the CBA for evidence of intent, the Sixth Circuit concluded that the retiree benefits were vested and continued beyond the duration of the CBA. *Id.* In concluding that the CBA's "general durational clause [was] insufficient to defeat vesting," the Sixth Circuit relied primarily on two factors. *Id.* at 140 (quoting *Yard–Man*, 716 F.2d at 1482–83). First, the *Yard–Man* court reasoned that retiree benefits ordinarily vest because they are "permissive[,] not mandatory subjects of bargaining." *Id.* (quoting *Yard–Man*, 716 F.2d at 1482). Second, the Sixth Circuit "viewed retiree benefits as 'status' benefits which carried with them an inference that they continue so long as the prerequisite status is maintained." *Id.* (quoting *Yard–Man*, 716 F.2d at 1482).

"The Sixth Circuit, therefore, adopted what has become commonly known as the 'Yard–Man inference,' pursuant to which courts presume that the parties intended retiree welfare benefits to continue for life, notwithstanding the expiration of a collective bargaining agreement." *Id.* To courts within the First, Fourth, Sixth, and Eleventh Circuits, this inference exerted a fair amount of influence on how these cases were resolved. *Id.* In *Yard–Man*, for instance, the inference was so strong that the court rejected the company's argument that the general durational clause, which provided for the termination of the CBA on a particular date, defeated any inference that the retirement benefits had vested. *Id.* The Fifth and Eighth Circuits, however, declined to follow the *Yard–Man* inference. *Id.*

After a thorough analysis of *Yard–Man* and its progeny, the *Skinner* court also declined to follow the *Yard–Man* inference, and specifically rejected the "Sixth Circuit's view that retiree benefits are 'status' benefits which carried with them an inference that they continue so long as the prerequisite status is maintained." *Id.* Instead, the Third Circuit agreed with the reasoning of the Eighth Circuit that Congress had "explicitly exempted welfare benefits from ERISA's vesting requirements," and therefore any presumption in favor of vesting was likely contrary to Congressional intent. *Id.* at 140–41 (quoting *Anderson v. Alpha Portland Indus., Inc.*, 836 F.2d 1512, 1517 (8th Cir.1988)). Specifically, the Third Circuit found that Congress had intentionally "reject[ed] the automatic vesting of welfare benefits" because "to require the vesting of those ancillary benefits would seriously complicate the administration and increase the cost of plans whose primary function is to provide retirement income." *Id.* at 138 (quoting *Hozier v. Midwest Fasteners, Inc.*, 908 F.2d 1155, 1160 (3d Cir.1990)). The *Skinner* Court further reasoned that "to vest benefits is to render them forever unalterable." *Id.* at 139. "Because vesting of welfare plan benefits constitutes an extra-ERISA commitment," the Third Circuit imposed the requirement that "an employer's commitment to vest such benefits ... not be inferred lightly and must be stated in *clear and express language.* " *Id.* (emphasis added).

Applying that standard to the phrases "will continue" and "shall remain" in the relevant provisions of the CBAs before the court without the benefit of the *Yard–Man* inference, the Third Circuit found that a plain reading of those phrases "does not *unambiguously* indicate that benefits will continue *ad infinitum.*" *Id.* at 141. The court explained as follows:

It cannot be said that the phrases clearly and expressly indicate vesting since there is simply no durational language to qualify these phrases. That is, the CBAs do not state that retiree benefits 'will continue for the life of the retiree,' or that they 'shall remain unalterable for the life of the retiree.' An equally reasonable interpretation is that the benefits 'will continue until the CBA expires,' or that they 'shall remain...until the CBA expires.'

*Id.* The court opined that the latter interpretation appeared more reasonable in light of the durational provisions included in all of the CBAs, noting the following CBA provision as illustrative:

"This Agreement represents a complete resolution of all noneconomic items and shall, in all of its terms, remain in effect from July 1, 1986 until midnight, June 30, 1989."

*Id.* Read in conjunction with such a durational clause, the Third Circuit determined that the phrase "will continue" "could be interpreted to mean, for instance, that medical benefits 'will continue until midnight of June 30, 1989.'" *Id.* Relying on the Second Circuit's decision in *Joyce v. Curtiss–Wright Corp.*, 171 F.3d 130 (2d Cir.1999), the court found that the language of the CBAs did not unambiguously vest lifetime retiree benefits, noting that the retirees' contentions to the contrary "constituted 'extensive linguistic contortion' in an attempt to 'manufacture' ambiguity where it did not exist." *Id.* at 142 (quoting *Joyce v. Curtiss–Wright Corp.*, 171 F.3d 130, 134 (2d Cir.1999)). The Third Circuit thus refused to "infer a binding obligation to vest benefits absent some language that itself reasonably supports that interpretation." *Id.* (quoting *Joyce*, 171 F.3d at 135).

The Third Circuit likewise rejected the retirees' alternative argument that the phrases "will continue" and "shall remain" are ambiguous, thereby precluding summary judgment, because the phrases could be interpreted to mean that the employer would pay for benefits for the life of the retiree. *Id.* Noting that the premise of this argument appeared to be that the phrases have prospective meaning only, the Third Circuit observed that the structure of the contract, construed as a whole, "reveal[ed] that just the opposite was intended, that the terms were used to refer back to previous CBAs." *Id.* As an example, the court pointed out that when the amount of coverage was increased from the prior CBA, the agreements utilized the phrase "shall be increased." *Id.* However, when the amount of coverage stayed the same, the agreements used the phrase, "shall remain." *Id.* at 142–43. Similarly, when a new type of coverage was obtained, the agreements used language such as "will provide," but when the coverage was the same kind as furnished under the prior CBA, the language used was "will continue." *Id.* Thus, "[r]ather than indicating a promise on the part of the company to provide such coverage prospectively for the life of the retiree," the court found that "the phrases were used to indicate a continuation of *prior* practices and policies." *Id.* at 143. The court noted that the retirees' reading would only have legitimacy if viewed in a "vacuum, without considering the appropriate contexts in which they were used." *Id.*

 In the instant case, Plaintiffs argue that the Supreme Court's decision in *Tackett* rejected all presumptions for or against vesting, including the Third Circuit's "clear and express" standard, and therefore *Skinner* is no longer good law.[2]

---

**2.** Plaintiffs rely, in part, on Justice Ginsburg's four justice concurrence, in which she stated that, "[c]ontrary to M&G's assertion,...no

*See Tackett*, 135 S.Ct. at 933; *see also Smathers v. Multi–Tool, Inc./Multi–Plastics, Inc. Emp. Health and Welfare Plan*, 298 F.3d 191, 196 (3d Cir.2002) (acknowledging that *Skinner's* standard amounts to a presumption against vesting in cases involving welfare benefit plans). The court disagrees.

In its unanimous decision, the Supreme Court rejected the inferences set forth in *Yard–Man* and its progeny, and reaffirmed that collective bargaining agreements are to be interpreted "according to ordinary principles of contract law." *Tackett*, 135 S.Ct. at 933. The Court re-emphasized that a court's objective when interpreting a collective bargaining agreement, as with any contract, is to give effect to the contractual rights and expectations of the parties. *Id.* "Where the words of a contract in writing are clear and unambiguous, its meaning is to be ascertained in accordance wit h its plainly expressed intent." *Id.* (quoting 11 R. Lord, Williston on Contracts § 30:6, p. 108 (4th ed. 2012)). The Court criticized the Sixth Circuit's *Yard–Man* inference for failing "to consider the

traditional principle that courts should not construe ambiguous writings to create lifetime promises." *Tackett*, 135 S.Ct. at 936 (citing 3A. Corbin, Corbin on Contracts § 553, p. 216 (1960)). Instead, "[c]ontractual obligations will cease, in the ordinary course, upon termination of the bargaining agreement." *Id.* (quoting *Litton*, 501 U.S. at 207, 111 S.Ct. 2215). The Court also rejected the Sixth Circuit's inference that tying retiree health benefits to the receipt of a pension mean that the parties intended those health benefits to continue for the duration of the pension benefits, that is, for life. *Id.* at 937. The Court concluded that any such "inferences [are] inconsistent with ordinary principles of contract law." *Id.*

■ While notable, *Tackett* has no major substantive impact on the Third Circuit's decision in *Skinner*. Although the Third Circuit has acknowledged that *Skinner's* "clear and express" standard amounts to a presumption against vesting, *Smathers*, 298 F.3d at 196, it has not applied the standard as a bright-line rule that would suspend all discussion of tradi-

---

rule requires 'clear and express' language in order to show that parties intended healthcare benefits to vest." *Tackett*, 135 S.Ct. at 938 (Ginsburg, J., concurring). Instead, a n employer may still be constrained after the collective-bargaining agreement's expiration by both explicit and "implied terms." *Id.* (citing *Litton Fin. Printing Div., Litton Business Systems, Inc., NLRB*, 501 U.S. 190, 207, 111 S.Ct. 2215, 115 L.Ed.2d 177 (1991).) However, contrary to Justice Ginsburg's assertion that "no rule requires 'clear and express' language" in order to vest benefits, the unanimous *Tackett* Court issued no specific holding on this point, even though the Court was presented with a question related to the Third Circuit's requirement of "a clear statement that health-care benefits are intended to survive the termination of the collective bargaining agreement." Question Presented, No. 13–1010, 2014 WL 708889, *Tackett*, 134 S.Ct. 2136 (2014), http.www.supremecourt.gov/qp/13-01010qp.pdf. Although a concurrence may

carry persuasive value, "federal courts should not give 'much precedential weight' to a concurring opinion, even if it coheres with the majority opinion." *B.H. ex rel. Hawk v. Easton Area Sch. Dist.*, 725 F.3d 293, 321 (3d Cir. 2013) (quoting *Alexander v. Sandoval*, 532 U.S. 275, 285 n. 5, 121 S.Ct. 1511, 149 L.Ed.2d 517 (2001)). Indeed, a majority opinion does not become "coextensive with the concurrence because their opinion does not expressly preclude…the concurrence's approach." *Alexander*, 532 U.S. at 285 n. 5, 121 S.Ct. 1511. Such a result would place the majority in "an odd predicament if a concurring minority of the Justices could force the majority to address a point they found it unnecessary (and did not wish) to address." *Id.* Therefore, as the unanimous *Tackett* Court refused to address the Third Circuit's clear and express language standard, the court declines to follow Justice Ginsburg's additional guidance as it applies to said standard.

tional principles of contract interpretation when such language is not present. Rather, when confronted with the absence of clear and express language, the Third Circuit has continued to conduct ambiguity analyses. For example, in *Skinner*, after rejecting "the appellants' contention...that the language of the CBAs unambiguously vested lifetime medical and life insurance benefits for retirees," the Third Circuit extensively analyzed appellants' alternative arguments that certain phrases describing retiree benefits were ambiguous and that extrinsic evidence in the form of various testimonies established that an ambiguity existed. *Skinner*, 188 F.3d at 142–45. The court concluded that the phrases were not ambiguous when read in t he context of other collective bargaining agreements between the parties, stating that "extrinsic evidence...may *not* be used to create an ambiguity where none exists." *Id.* at 142–45.

As the First Circuit has explained, *Skinner* "does not set forth a strict clear and explicit statement rule." *Senior v. NSTAR Elec. and Gas Corp.*, 449 F.3d 206, 217 (1st Cir.2006). Instead, "the bulk of the court's opinion in *Skinner* [ ] relied on traditional rules of contract construction to determine the meaning of the CBA," and "undertook an extended discussion of the plaintiffs' argument that the contract was ambiguous, which likely would have been unnecessary had the court in fact relied on a strict clear and express statement rule." *Id.*

This interpretation receives further support from two subsequent Third Circuit cases relying on *Skinner*. In *Int'l Chem. Workers Union Council of the United Food and Commercial Workers Union v. PPG Indus., Inc.*, 236 Fed.Appx. 789, 791–93 (3d Cir.2007), the Third Circuit considered if retiree health benefits had vested in order t o determine whether the parties had a duty to arbitrate under the CBAs. In deciding that the CBAs' termination provisions read in conjunction with those relating to retiree health benefits prevented the vesting of such benefits, the Third Circuit did not foreclose but instead addressed the union's claim that the relevant provisions of the CBAs and GIPs created an ambiguity precluding summary judgment. *Id.* at 793–94. Seven years later, in the class action suit *Lewis v. Allegheny Ludlum Corp.*, 579 Fed.Appx. 116, 117–18 (3d Cir. 2014), a group of retirees claimed that their former employer had breached CBAs allegedly promising lifetime, no cost health care. After noting that a presumption existed against vesting in welfare benefit plan cases, the Third Circuit found that the retirees had failed to identify any clear and express language that conferred "unalterable, vested life time health benefits." *Lewis*, 579 Fed.Appx. at 119. However, later in the opinion, the Third Circuit again briefly tackled retirees' attempts to create an ambiguity instead of finding that such an argument was precluded due to a failure to find clear and express language. *Id.* The above cases thus demonstrate that, in applying a clear and express language rule, the Third Circuit merely enforced a traditional rule of contract construction, that, "[w]here the words of a contract in writing are clear and unambiguous, its meaning is to be ascertained in accordance with its plainly expressed intent." *Tackett*, 135 S.Ct. at 933 (quoting 11 R. Lord, Williston on Contracts § 30:6, p. 108 (4th ed. 2012)).

Based on the foregoing, the court concludes that *Skinner*'s "clear and express" language requirement remains binding law in the Third Circuit post-*Tackett*.

### D. Interpreting the Language of the CBAs

 Under *Tackett*, courts must "interpret collective-bargaining agreements,

including those establishing ERISA plans, according to ordinary principles o f contract law, at least when those principles are not inconsistent with federal labor policy." *Tackett*, 135 S.Ct. at 933; *see also Skinner*, 188 F.3d at 138. Because the objective of contract interpretation is to ascertain the parties' intent, *Baldwin v. Univ. of Pittsburgh Med. Ctr.*, 636 F.3d 69, 75 (3d Cir.2011) (citing *Am. Eagle Outfitters v. Lyle & Scott Ltd.*, 584 F.3d 575, 587 (3d Cir.2009)), the contract must be "read to give effect to all its provisions and to render them consistent with each other." *Mastrobuono v. Shearson Lehman Hutton, Inc.*, 514 U.S. 52, 63, 115 S.Ct. 1212, 131 L.Ed.2d 76 (1995)(citations omitted).

■■■■■ When interpreting a collective bargaining agreement, a court must:

> hear the proffer of the parties and determine if there are objective indicia that, from the linguistic reference point of the parties, the terms of the contract are susceptible of different meanings. Before making a finding concerning the existence or absence of ambiguity, we consider the contract language, the meanings suggested by counsel, and the extrinsic evidence offered in support of each interpretation. Extrinsic evidence may include the structure of the contract, the bargaining history, and the conduct of the parties that reflects their understanding of the contract's meaning.

*Teamsters Indus. Emps. Welfare Fund v. Rolls–Royce Motor Cars, Inc.*, 989 F.2d 132, 135 (3d Cir.1993)(citations and quotations omitted); *see also Skinner*, 188 F.3d at 142. Thus, a court may find it "necessary to consider the scope of other related [CBAs], as well as practice, usage and custom pertaining to all such agreements." *Rosano v. Township of Teaneck*, 754 F.3d 177, 190 (3rd Cir.2014) (quoting *Transp.– Commc'n Emps. Union v. Union Pac. R. Co.*, 385 U.S. 157, 161, 87 S.Ct. 369, 17 L.Ed.2d 264 (1966)). However, extrinsic

evidence may never be used "to create an ambiguity where none exists." *Skinner*, 188 F.3d at 145. While collective bargaining agreements will "often incorporate[ ] express or implied terms that are designed to give [the parties] a degree of freedom of action with a specified area of activity," *Consol. Rail Corp. v. Ry. Labor Execs. Ass'n*, 491 U.S. 299, 308, 109 S.Ct. 2477, 105 L.Ed.2d 250 (1989), "it is elementary that one cannot imply a term or promise in a contract which is inconsistent with an express term of the contract itself." Williston on Contracts § 63:21; *see also USX Corp. v. Prime Leasing Inc.*, 988 F.2d 433, 438 (3d Cir.1993) ("[O]ne can invoke 'implied' terms only when there are no express term s in the contract relating to the particular issue.").

With the above principles in mind, the court will turn to the parties' arguments regarding the proper interpretation of the relevant Plan documents governing the members of each subclass.

### 1. Subclass A

Defendants have moved for summary judgment as to Subclass A. In their motion for summary judgment, Defendants contend that all benefits arising under the pre-1984 CBAs are subject to the durational clauses contained in each individual agreement, and therefore, any entitlement to retiree benefits expired along with the relevant CBA and GIP. (Doc. 99, pp. 17-18 of 46.) Plaintiffs, on the other hand, argue that the language of the 1981 GIP, under which the majority of Subclass A members retired, creates an ambiguity, thereby precluding the entry of summary judgment for Defendants. (Doc. 102, p. 33 of 43.) Specifically, Plaintiffs point to a 1981 GIP provision stating that qualified retirees and eligible defendants "shall have the following benefits...continued after retirement at no cost." ( *Id.*) Plaintiffs argue that, unlike the phrases "shall remain" and

"will continue" in *Skinner*, this provision does not indicate a continuation of prior practice and policies, but instead indicates a promise to provide prospective coverage for the life of the retiree. (Doc. 102, p. 41 of 52.)

 As in *Skinner*, a plain reading of the phrase, "shall have the following benefits...continued" does not unambiguously indicate that the benefits will be continued for the life of the retiree notwithstanding the expiration of the applicable CBA. *Skinner*, 188 F.3d at 141. Rather, in light of the durational clauses included in all of the pre-1984 CBAs and the lack of any durational language to qualify the phrase, a more reasonable interpretation is that, as in *Skinner*, the benefits would be continued until the applicable CBA expires. *Id.* For example, Article 37 of the 1981 CBA, which explicitly applied to retiree health benefits per Article 35,[3] stated that the Agreement would "remain in full force and effect until midnight October 31, 1984."[4] (Doc. 97-9, p. 143 of 196.) Thus, read in conjunction with the above durational clause, the promise to have "the following benefits...continued" expired at midnight of October 31, 1984. *See Skinner*, 188 F.3d at 141. As such, an employee who retired under the 1981 CBA had no contractual entitlement to continued benefits thereafter. Rather, the benefits existed on a contract-to-contract basis and, thus, had not vested. This interpretation is consistent with *Tackett*'s instruction to follow the important principle of contract interpretation that "[c]ontractual obligations will cease, in the ordinary course, upon termination of the bargaining agreement." *Tackett*, 135 S.Ct. at 937; *see also Gallo v. Moen Inc.*, 813 F.3d 265, 269 (6th Cir. 2016) ("[W]e should not expect to find lifetime commitments in time-limited agreements.") (citing *Tackett*, 135 S.Ct. at 936).

Furthermore, the court does not believe that the phrase, "shall have the following benefits...continued," is ambiguous when read in its proper context. In *Skinner*, the Third Circuit found that the phrases "shall remain" and "will continue" were used to refer back to previous CBAs and thus represented "a continuation of *prior* practices and policies," rather than any guarantee o f unalterable, lifetime benefits. *Skinner*, 188 F.3d at 143. In its proper context here, the phrase "shall have the following benefits ...continued" relates to the continuation of certain benefits that retirees had enjoyed during their employment, such as "Hospital Expense Benefits; Surgical Expense Benefits; Medical Expense Benefits; Diagnostic X-Ray & Laboratory Benefits; [and] Prescription Drug Benefits" (Doc. 97-10, p. 69 of 79), and certainly does not guarantee unalterable benefits "prospectively for the life of the retiree." *Skinner*, 188 F.3d at 143. The section immediately following the retiree continued benefits provision in the 1981 GIP further bolsters this interpretation:

**Benefits NOT Continued After Retirement**

were subject to all provisions of the CBA, including the durational clause.

3. Article Thirty-Five of the 1981 CBA reads as follows:

> The parties have provided for a Group Insurance Program in a separate booklet which is part of this Agreement as if set out in full herein, *subject to all provisions of this Agreement.*

(Doc. 97-9, p. 142 of 196 (emphasis added).) Thus, while members of Subclass A were provided retiree health benefits, those benefits

4. Similar general durational restrictions setting an exact expiration date for the agreement's effectiveness can be found in every CBA stretching back to 1973. (Doc. 97-4, p.100 of 129; Doc. 97-5, pp. 107-08 of 153; Doc. 97-7, pp. 111-12 of 166.)

Upon retirement, employees will no longer be insured for Accidental Death and Dismemberment, Survivor Income, Accident and Sickness, Long Term Disability, Vision Care or Dental Benefits. (*Id.*) Accordingly, when read in its proper context, there appears to be no textual support for Plaintiffs' argument that the phrase, "shall have the following benefits ...continued" is evidence of the parties' intent to vest health benefits for the life of the retirees.

Nevertheless, Plaintiffs argue that the parties' intent and reasonable understanding can further be derived from the deposition testimony of Chris Castle, York International's York Plant manager who negotiated and executed the 2000 and 2003 CBAs for the Company, and the 2003 correspondence of Mr. Castle's superior, Michael Anderson, York International's vice president for the York Plant. (Doc. 102, pp. 36-38 of 43.) However, there is no evidence indicating that either individual participated in the negotiation or execution of the 1981 CBA, which describes retiree benefits differently than the 2000 and 2003 GIPs.[5] Although Plaintiffs point to Mr. Castle's testimony that the 2000 GIP provided benefits "basically in perpetuity" and "that the retirees would have health care coverage until they died, basically," (Doc. 102, p. 36 of 43), Plaintiffs must show "that the employer intended the welfare benefits to be vested." *Skinner*, 188 F.3d at 138–39. It is clear from Mr. Castle's deposition, however, that he did not understand whether the benefits had unalterably vested:

Q. Do you remember if there was ever any discussion about the company being able to change the benefits for the retirees?

A. I don't think that—I thought I was advised at the time we can't. I don't know if we can't meant that it would cause them to lock up and us not to get to where we want to, or because we had some contractual obligation or some other obligation that prevented us from changing them. But it was just never something that we would go after or chose to. I can't make the differentiation between whether that was policy or because of the contract itself.

(Doc. 96-17, at 47: 7-19). Mr. Castle's lack of understanding on the critical issue of vesting thus indicates that he cannot competently testify as to the Company's intent. While Plaintiffs also argue that Mr. Castle's testimony reveals that the Union was unwilling to negotiate regarding benefits for retirees, such testimony would not equate to an intention on the part of the Company to create an unalterable vested right to benefits. (Doc. 102, p. 37 of 43.) Similarly, Mr. Anderson's 2003 correspondence speaking of "lifetime" benefits was sent over twenty years after the 1981 CBA's execution and does not indicate an intent to vest benefits sufficient to overcome the express language of the governing documents. (Doc. 97-18; 97-21, p. 4 of 6.) At best, Plaintiffs' proffered extrinsic evidence demonstrates that the Company intended retiree welfare benefits to last for the life of the retiree *subject* to the CBA's duration, and not that the Company intended the benefits to vest "forever unalterabl[y]." *Skinner*, 188 F.3d at 139.

In conclusion, Plaintiffs concede that no contract provision in the 1981 CBA clearly and expressly states that retiree benefits

---

5. The 1981 CBA states that "employees who retire...shall have the following benefits... continued after retirement at no cost" while the 2000 and 2003 GIPs provide that "health insurance is continued until your death." (Doc. 97-10, p. 69 of 79; Doc. 97-24, p. 10 of 50; Doc. 97-27, p. 12 of 55.)

are vested and unalterable, and the court cannot conclude that the provision continuing medical benefits after retirement creates an ambiguity. When the CBA and the GIP are read together an d in their entirety, it is clear that "shall have the following benefits...continued" is not "subject to reasonable alternative interpretations," *Skinner*, 188 F.3d at 143, but instead refers only to those benefits carried over to retirement from employment and not to an unalterable, lifetime continuance superseding the general durational clauses specifically applicable to all GIP provisions. While extrinsic evidence may be used to determine whether a contract is ambiguous, the lack of ambiguity in the documents precludes Plaintiffs' extrinsic evidence from creating an ambiguity here. Therefore, the court will grant Defendant's motion for summary judgment as to Subclass A.

### 2. Subclasses C, D, and E

Both Plaintiffs and Defendants move for summary judgment as to Subclasses C, D, and E, for which the CBAs and GIPs in effect from July 1, 1996 to July 30, 2006 apply. In moving for summary judgment as to these subclasses, Plaintiffs rely on language included in the 1996 through 2006 GIPs under the heading "Termination of Coverage," which states as follows:

> Your health coverage is continued *until your death*—unless you request termination of coverage or you do not make the required contribution for this Plan. And your dependents' health coverage will be continued—*while you are living*....[Surviving spouses] will remain eligible *until the earlier of death or remarriage.*

(Doc. 97-12, pp. 94-95 of 175; Doc. 97-14, pp. 93-94 of 163; Doc. 97-16, p. 81 of 130; Doc. 97-18, p. 81 of 130; Doc. 97-21, pp. 11-12 of 51; Doc. 97-24, pp.10-11 of 50; Doc. 97-27, pp. 12-13 of 55 (emphasis added).)

Plaintiffs argue that the italicized language unambiguously establishes that members of these subclasses have a right to vested, uncapped benefits extending beyond the relevant CBA's expiration. In support of their argument, Plaintiffs note that the *Skinner* court postulated that a CBA phrase providing that retiree benefits "will continue for the life of the retiree" may indicate an intent to vest. Defendants, on the other hand, contend that they are entitled to summary judgment as to Subclasses C, D, and E because no language in the pertinent CBAs or GIPs clearly indicates an agreement that the Company would provide vested lifetime health benefits to retirees, and that any benefits entitlement expired along with the relevant CBA.

While at first glance the phrase "until your death" appears to be coextensive with the Third Circuit's hypothetical phrase "for the life of the retiree," *Skinner*, 188 F.3d at 141, the court cannot read the phrase "until your death" in a vacuum. Rather, the court must interpret the contract in a manner that gives reasonable meaning to all of its provisions and gives effect to all provisions of the contract. *See* 11 Williston on Contracts § 32:5 (4th ed.) (stating that a contract must "be read as a whole and every part will be read with reference to the whole"). In the context of collectively-bargained retiree health benefits, an employer's obligation to provide health benefits typically expires when the CBA expires. *Tackett*, 135 S.Ct. at 936–37 ("[C]ontractual obligations will cease, in the ordinary course, upon termination of the bargaining agreement.") As with Subclass A, each of the CBAs and GIPs applicable to Subclasses C, D, and E included durational clauses wit h exact expiration dates that have since expired. Read in conjunction with the relevant durational clause, the "until death" language must therefore be interpreted to mean

that a retiree is entitled to the benefits provided by the CBA, by way of the corresponding GIP, for the entire term of the CBA, but that such benefits terminate in the event of the retiree's death if it should occur during the term of the CBA.

In *Crown Cork & Seal Co., Inc. v. Int'l Assoc. of Machinists and Aerospace Workers*, 501 F.3d 912 (8th Cir.2007), the Eighth Circuit addressed nearly identical language to that at issue here:

> Your personal coverage continues until your death. Your Dependent spouse's coverage continues after your death until the earlier of his or her death or remarriage. Your Dependent children's coverage continues after your death…

*Id.* at 918. While finding that a strong reservation of rights clause precluded vesting, the court noted that, even without the reservation of rights clause, the above language providing benefits "until death" did not represent "explicit vesting language." *Id.* Likewise, in *Cherry v. Auburn Gear, Inc.*, 441 F.3d 476 (7th Cir.2006), the Seventh Circuit held that similar language only provided the retirees with lifetime health coverage to last during the effective periods of the CBAs under which they retired. *Id.* at 482–83. Here, as in *Crown* and *Cherry*, the expressed durational limits indicate that retiree health benefits were no longer guaranteed after the CBA's expiration, but instead were subject to renegotiation.

Indeed, the parties understood that existing retiree health benefits were subject to modification each time the parties reconvened to negotiate a new labor contract, and often the benefits were, in fact, altered. Together, these GIP to GIP alterations are evidence of the parties' custom and practice, establishing that retiree benefits were not vested but instead subject to bargaining with every new CBA. *See John Morrell & Co. v. United Food and Commercial Workers Int'l Union, AFL–CIO*,

37 F.3d 1302, 1307 (8th Cir.1994) (citation omitted) ("[T]he fact that modifications were routinely negotiated is fundamentally inconsistent with the notion that *any* retirement health benefits were *ever* vested.") Courts have reconciled the contract-to-contract nature of collective bargaining with "lifetime" language by concluding that the obligation to provide lifetime benefits ended with the expiration of the relevant CBA. *Cherry*, 441 F.3d at 482; *PPG*, 236 Fed.Appx. at 793. As the Seventh Circuit has explained, "[t]he problem for the plaintiffs is that 'lifetime' may be construed as 'good for life unless revoked or modified.'" *Vallone v. CNA Fin. Corp.*, 375 F.3d 623, 633 (7th Cir.2004) (citation omitted). The *Cherry* court, addressing a spousal provision nearly identical to the one at issue here, similarly concluded:

> The retirees argue that the [CBA] is implicitly extended beyond its three-year term by a clause that provides benefits for surviving spouses until their death or remarriage. This provision, however, refers to the eligibility of individuals to receive benefits under the agreement, not to the duration of the agreement. Surviving spouses were eligible to receive benefits *only so long as the [CBA] was in place.*

*Cherry*, 441 F.3d at 483(emphasis added). Here, as in the above cases, language stating that health coverage is provided until the retirees' or their spouses' "death" means that the parties negotiated lifetime health coverage to last during the term of the CBA under which the individual retiree retired.

Relying on *Bland v. Fiatallis N.A., Inc.*, 401 F.3d 779 (7th Cir.2005), Plaintiffs nonetheless argue that, in the absence of an express reservation of rights clause, the "until death" language at issue here is durational language indicating that retiree benefits outlast the expiration of the rele-

vant CBA. *See id.* at 786 (holding that, "in the absence of a reservation of rights clause, we are convinced (not surprisingly) that . . . 'lifetime' is durational, meaning 'for life.' "). However, the *Bland* court clarified that "until death" is not the functional equivalent of the lifetime language before it, which was "stronger and more explicit than language in comparable cases." *Id.* In doing so, the court pointed to a Fifth Circuit case with weaker language involving a CBA "stating that retirees were entitled to comprehensive medical benefits 'until the death of the retired employee.' " *Id.* (citing *Int'l Ass'n of Machinists & Aerospace Workers, Woodworkers Div., AFL–CIO v. Masonite Corp.*, 122 F.3d 228, 233 (5th Cir.1997)). The Fifth Circuit, in turn, found that the phrase "until death" does not automatically vest lifetime benefits, but instead "can be construed either as a limiting or right-granting provision." *Masonite*, 122 F.3d at 233–234. Here, in the presence of strict durational language in the CBAs and incorporated GIPs, the "until death" language is not a lifetime guarantee of unalterable benefits extending beyond the contract's expiration but is instead a limiting provision. The retirees were entitled to benefits during the term of the applicable CBA, unless their death came before the CBA's expiration.

Furthermore, although the CBAs and GIPs applicable to Subclasses C, D, and E lack an express reservation of rights clause,[6] two provisions appearing immediately before and after the disputed "until death" provision indicate that the Company retained the power to amend, modify, or terminate the retirees' benefits. To-

gether, the provisions provide that, "[i]n the event [the] group plan is terminated, coverage for [retirees] and [their] dependents will end immediately," but that retirees will retain the option to convert their group insurance policies to individual health insurance policies. (*See* Doc. 97-21, pp. 11-12 of 51; Doc. 97-24, pp. 10-11 of 50; Doc. 97-27, pp. 12-13 of 55.) In addressing nearly identical language, the Tenth Circuit found that the conversion clause, together "with the provision stating that insurance terminates when the policy terminates, . . . demonstrates [that the d]efendants had the power to terminate a retiree's group life insurance benefit." *Fulghum v. Embarq Corp.*, 785 F.3d 395, 406–07 (10th Cir.2015). Here, as in *Fulghum*, these provisions indicate that the Company retained the power to terminate benefits, and, as such, any intent to vest benefits would have rendered the provisions superfluous.

Finally, a review of the extrinsic evidence in this case further supports the court's interpretation of the relevant contractual language. As discussed in relation to Subclass A, Mr. Castle did not know whether the benefits were unalterably vested. In addition, although Plaintiffs argue that Mr. Castle's testimony indicates that the Union refused to negotiate retiree benefits, a refusal to negotiate by the Union does not equate with the Company's vesting of lifetime benefits or inability to reserve its right to amend, modify, or terminate benefits. Furthermore, any notion that the Union refused to negotiate is contradicted by the periodic renegotiation of

---

6. Plaintiff's suggest that the 1996 switch to two separate GIP booklets—one for active employees and one for retirees—is suggestive of the parties' intent to vest benefits for retirees. Specifically, Plaintiffs argue that the omission of reservations of rights language in the retirees' portion of the split GIP booklet "shows that the parties did not intend that the

reservation o f rights apply to retirees." (Doc. 102, p. 31 of 43.) However, *Tackett* and *Skinner* preclude the court from inferring a vested benefit in the absence of clear and express language demonstrating the employer's agreement to provide a lifetime benefit. Here, no such vesting language exists.

the GIPs, which necessarily required bargaining between the parties. Indeed, Plaintiffs concede this point by arguing that these "detrimental changes to existing retirees' benefits ... w[ere] part of a broad package of improvements the Union negotiated" (Doc. 102, p. 41 of 43), thus indicating that the Union could and di d negotiate retiree benefits. Furthermore, Mr. Anderson's July 7, 2003 and July 23, 2003 correspondence[7] referring to "lifetime" benefits fail to distinguish between "lifetime" benefits until the CBA expired or lifetime benefits extending past CBA expiration. In addition, Mr. Anderson's references to early retirement options offered by the Company reveal that these options were the subject of negotiation, a fact reflective of the parties' practice to modify retiree benefits with every new GIP and incompatible with vested benefits. As a result, the court finds that reading Plaintiffs' cumulative extrinsic evidence in their suggested light would result in finding implied terms inconsistent with the CBAs' and GIPs' express terms and would create an ambiguity where none exists.

In conclusion, the CBAs and GIPs have explicit durational clauses providing the exact date and time when those documents ceased to be in effect, as well as additional language contemplating the termination of retiree health benefits. In the face of these provisions, the "until death" language does not constitute clear and express vesting language sufficient to overcome the durational provisions. Because *Tackett* instructs that such durational language must be given effect, the court finds that the CBAs and GIPs governing Subclasses C, D, and E did not promise any benefits beyond the expiration of the relevant contract. Plaintiffs vesting claims thus fail, and summary judgment will be entered in favor of Defendants as to these Subclasses.

### 3. Subclasses B and F

Defendants have moved for summary judgment as to Subclasses B an d F, arguing that, in addition to lacking clear and express vesting language beyond the expiration of the relevant CBA, the reservation of rights clauses contained in the applicable plan documents foreclose any claim of vesting. (Doc. 99, pp. 26-27, 34-35 of 49; Doc. 108, pp. 14-16 of 60.) While Plaintiffs do not dispute that the documents contain reservation of rights clauses, they argue that the Union strongly objected to the inclusion of the language within the plan documents and, therefore, the provisions are not a valid part of the plan. (Doc. 102, pp. 31-33 of 43.)

The plan documents governing Subclasses B and F contained express reservations of rights language. The 1984, 1987, 1990, and 1993 GIPs governing Subclass B

---

7. The court is referring to Mr. Anderson's July 7, 2003 letter (Doc. 96-18) and his July 23, 2003 e-mail (Doc. 96-21). Mr. Anderson's letter addressed the ongoing 2003 CBA negotiations' importance to York Plant employees. (Doc. 96-18.) The letter references a Company proposal offering an early retirement option that would provide "early pension and lifetime flexchoice medical benefits" to minimize the negative effects of job reductions on plant employees (*id.* at p. 4), and urges employees to consider the importance of "retaining a Lifetime Medical Plan" in a difficult economy (*id*). Mr. Anderson's July 23, 2003 e mail stated that employees "affected by layoffs due to product moves... will receive a combination of lifetime medical plan and early pension at an abated amount." (Doc. 96-21, p. 4 of 6.) The court notes that both the letter and e-mail refer to the Company's intent to move employees from their current UAW benefit plan to a FlexChoice benefit plan, the latter of which was "a lower cost plan to the Company." (Doc. 97-18, p. 3-4; Doc. 97-21, p. 4.) Thus, the email and letter reflect the Company's concern with the "administration and increase [in] the cost of [t hose] plans," which was the motivating factor behind Congress's rejection of the automatic vesting of welfare benefits. *Skinner,* 188 F.3d at 138.

granted the Company "the right to modify, amend, suspend or terminate [the plans] at any time." (Doc. 97-12, p. 162 of 175; Doc. 97-14, pp. 150-51 of 163; Doc. 97-16, p. 122 of 130; Doc. 97-18, p. 122 of 130.) The 2006 GIP governing Subclass F assigned the Company the "right to amend or terminate the benefits program or any portion of it at any time." (Doc. 97-28, pp. 3, 105 of 108.) This language is nearly identical to language which the Third Circuit has found to preclude any claim of vesting. *See Schoonejongen v. Curtiss–Wright Corp.*, 18 F.3d 1034, 1038 (3d Cir.1994) (finding no vesting where plan documents stated that "the Company reserves the right at any time and from time to time to modify or amend, in whole or in part, any or all provisions of the plan").

Indeed, Plaintiffs do not dispute that such language constitutes the type of reservations of rights clause that forecloses any claim of vesting. Instead, Plaintiffs argue that the reservation of rights clauses should not be considered part of the retiree benefit plans because the clauses were never negotiated by the parties. (Doc. 102, p. 31-32 of 43.) In support of their argument, Plaintiffs point to the testimony of Richard Sindlinger, a Union negotiator from 1973 to 2004, and Blaine Cunningham, a Union negotiator from 1986 to 2006. Sindlinger testified, in pertinent part, that the reservation of rights clauses were never part of the GIPs but were instead part of "a document the company wanted to put in this booklet because of ERISA. This was not negotiated between the parties. It was not part of the actual plan." (Doc. 103-3, p. 24 of 52.) Cunningham similarly testified that the parties did not negotiate the Subclass F reservation clauses. (Doc. 103-6, p. 23 of 24.) Plaintiff's arguments are unavailing.

The inclusion of a reservation of rights clause in every GIP booklet from 1984 to 2006 indicates a deliberate choice to not only include but renew the provision with each new CBA. In fact, Sindlinger testified that the Union allowed the section to go into the booklet. (Doc. 103-3, p. 24 of 52.) While he now states that it was only included as a "good-faith bargaining" tactic and to save the Company the additional cost of printing a separate booklet (*id.* at pp. 25, 28 of 52), the Union never objected to its inclusion through a grievance or lawsuit. Plaintiffs' belated objection now, decades after the fact, undermines their position and runs contrary to fundamental principles of contract law. Indeed, in cases such as this where there is an unambiguous reservation of rights clause contained in the plan documents, it is inappropriate to resort to extrinsic evidence at all. *See Skinner*, 188 F.3d at 145–46 (refusing to consider extrinsic evidence regarding the union members' belief that the parties' past practices trumped contract language); *see also Maytag Corp. v. UAW Local 997*, 687 F.3d 1076, 1086 (8th Cir.2012) ("When the applicable [plan document]...'explicitly reserves the right to modify the retiree medical benefit plan at any time,' beneficiaries 'have not met the burden of proving vesting language,' and extrinsic evidence may not be considered.") (citation omitted). Instead, the reservation of rights clause prevails. *See In re Unisys Corp.*, 58 F.3d at 903–04 (stating that if a "reservations of rights [clause] is broad and unequivocal, it will prevail over a promise of lifetime benefits.")

In conclusion, the reservation of rights language applicable to Subclasses B and F is clear and unambiguous, and forecloses any notion of vesting. As such, any testimony regarding the Union's alleged resistance to the inclusion of the language is irrelevant. Thus, the court will grant Defendants' motion for summary judgment as to Subclasses B and F.

## V. Conclusion

For the reasons set forth above, the court will deny Plaintiffs' motion to strike and grant Defendant's motion for summary judgment as to all Subclasses.

An appropriate order will issue.